UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RALPH  BROOKS, JR. on behalf      :      CIVIL ACTION
of himself and all others      :      NO.
similarly situated,      :
     :
         Plaintiff,      :
     :
         v.      :      JURY TRIAL DEMANDED
     :
WACHOVIA BANK, N.A.;      :
WACHOVIA CORPORATION;      :
EVERGREEN INVESTMENT      :
SERVICES, INC.; EVERGREEN      :
INVESTMENT MANAGEMENT      :
COMPANY, LLC. ;EVERGREEN      :
FUNDS and MICHAEL S. SCOFIELD,      :      CLASS ACTION
     :
         Defendants.      :

## COMPLAINT

Plaintiff, through his counsel, hereby alleges the following upon personal knowledge as to his

own acts and upon information and belief based, among other things, upon the investigation made by

plaintiff by and through such counsel as to the acts of the defendants as described herein. The majority of

evidence in support of plaintiff's claims is in defendants' exclusive possession, custody, or control.

Plaintiff's claims are likely to have additional evidentiary support after a reasonable opportunity for

discovery.

## BACKGROUND FACTS

1.      This Class Action is brought by plaintiff Ralph Brooks on his own behalf and on behalf of

all those similarly situated against the defendants arising out of, *inter alia,* breaches of fiduciary duty and

contractual duties owed to them by defendants. The defendants are:  Wachovia Bank, N.A., its parent,

Wachovia Corporation (collectively, with their respective corporate predecessors, the "Bank" or

"Wachovia"), Evergreen Investment Services, Inc. and Evergreen Investment Management Company,

LLC (collectively "Evergreen"), Evergreen Funds and Michael S. Scofield, who has been, at relevant

times since 1984 Chairman of the Board and of the Executive, Board Pricing and Litigation Oversight Committees of the Board of Trustees of Evergreen Funds, a Massachusetts business trust (the "Business Trust") that, on behalf of Wachovia, directly and indirectly operates the Evergreen Funds, a so-called family of mutual funds offered for sale by the Bank and its subsidiaries.  Plaintiff seeks damages from all defendants in connection with the investments of the assets of his own Wachovia fiduciary account and those of the members of the Class defined below in shares of defendant Evergreen Funds for the reasons set forth below. Plaintiff also seeks damages from defendant the Bank for fees charged to his and all other Wachovia fiduciary accounts for computerized "sweeping" of such accounts of idle cash as well as injunctive relief to, *inter alia*, deter the defendants from continuing to commit the wrongful acts as more fully described below.

2.      The actions of Wachovia as described in this Complaint have been consistent with the statements and advice provided by one legal commentator, Gregory B. Jordan, who is also counsel to the Bank, in a June 1, 1996 article (the "Jordan Article"):

> "It has been increasingly important to go beyond mere fee income in the trust area—profitable fee income is now key."

Jordan goes on to advise, most tellingly:

> "We must price our products and services profitably and **not be concerned about charging fairly for the services we provide**."
> [emphasis added]

3.      In 1988, when plaintiff was six years old, he was shot and crippled for life. In the wake of such shooting, The Philadelphia Daily News and Power 99 radio station ("WUSL-FM") publicized plaintiff's plight and began to raise funds for his benefit. Ultimately, funds were raised and deposited with a corporate predecessor of the Bank, CoreStates Bank, N.A. ("CoreStates"). A trust account was established on December 12, 1990 at CoreStates entitled "Ralph Brooks Educational Fund," ("Brooks Trust") the stated purpose of which was " to provide for the education of Ralph Brooks, Jr.". A second

trust account was established at CoreStates on the same date entitled "Children's Rehab Hospital Trust." The Brooks Trust was terminated on or about February 27, 2006.

4.      From time to time following the establishment of the Brooks Trust, CoreStates and its corporate successors, including First Union Bank ("FUB") and defendant Wachovia Bank, N.A., made distributions from the Brooks Trust account, which had been invested in, *inter alia*, Common Trust Funds ("CTFs"), a form of fee and expense-free pooled investment vehicle,  until the  CoreStates and other CTFs were closed and converted,  between December 1998 and July 1999, into investments in FUB's proprietary mutual funds, the Evergreen Funds f/k/a the Evergreen Keystone Funds as well as through substantively identical transactions at Wachovia and its Acquired Banks as defined below (the "Conversions"). The CTFs were commonly used by banks as a form of in-house mutual fund managed, for investment purposes, by the banks' personnel. With respect to CoreStates' CTFs, it made no independent charges for the investment-related expenses of the CTFs, which were subsumed by the fees that CoreStates and its successors charged to the Brooks Trust and other fiduciary accounts similarly situated.

5.      Upon the occurrence of the Conversions,  which were carried out in order to, *inter alia,* support FUB's family of proprietary mutual funds, the Evergreen Funds , the investment-related expenses of the Brooks Trust account and all other similarly affected fiduciary accounts at FUB increased significantly, even after so-called credits to minimize some of the negative effects of FUB's "double dipping," *i.e.,* charging fees for serving as a corporate fiduciary (which included all investment-related services) and the separate fees and other benefits Wachovia received and receives indirectly through Evergreen and the Evergreen Funds.

6.      The Evergreen Funds are referred to as the Bank's "proprietary" mutual funds because, *inter alia*, the Bank sponsors and controls the funds through the Business Trust, which is nominally

independent of the Bank but,  in fact,  is not; the funds are "advised" by Evergreen subsidiaries of Wachovia;  other subsidiaries of the Bank and/or Wachovia provide other "services" to the funds for which they are paid by the Evergreen Funds. Indeed, in 2001, in setting forth its corporate history, Wachovia referred to the completion of the merger between Wachovia and the "Evergreen Fund's [sic] umbrella company, First Union Corporation," the corporate parent of FUB…"to create the new Wachovia Corporation, of which Evergreen remains a subsidiary."

7.      The Business Trust is nominally under the control of a Board of Trustees which includes and has included defendant Michael S. Scofield. A majority of the Board is nominally "dis-interested; " in fact, all owe their positions and the substantial benefits that come with them to Wachovia and always act in Wachovia's best interests, rather than in the interests of the shareholders of the Evergreen Funds and those who had or have beneficial interests in them, such as plaintiff and the members of the Class herein. At all relevant times, defendant Scofield and the other Trustees of the Business Trust, in selecting the advisors and other contractors which provided services to the Evergreen Funds selected Evergreen and other subsidiaries of Wachovia on a no-bid basis, with the exception of Sub-Advisors to certain of the Evergreen Funds, which added to the total expenses borne by plaintiff and the members of the Class. Although they nominally went through the motions of a negotiation process with respect to the advisory and other services provided to the Evergreen Funds, at no time did defendant Scofield, his fellow Trustees or the Business Trust itself, despite their fiduciary duties to act in the best interests of plaintiff and the members of the Class, fulfill such duties. In virtually all instances known to plaintiff, they acted in Wachovia's  primary interests and aided and abetted the Bank's own breaches of fiduciary duties as described herein.

## WACHOVIA'S GOAL TO BE A NATIONWIDE FINANCIAL GIANT

8.     Over the course of the last 15 years, Wachovia has made numerous acquisitions of other financial institutions throughout the United States ("Acquired Banks"), many of which acquisitions were driven by Chairman and Chief Executive Officer, L.M. Baker, Jr. and his successor in 2003, G. Kennedy ("Ken") Thompson, assisted by their respective subordinates. On September 4, 2001, Wachovia Corporation and the parent of FUB, First Union Corporation, "completed their merger of equals," as proclaimed in the Bank's press release on such date. This transaction and other similar ones before and after it, reflected the personal objectives of Messrs. Baker and Thompson to create a nationwide banking franchise and, as well, their personal competition with their fellow Charlotteans, Hugh McColl, Jr. and Kenneth Lewis, who were doing the same thing with Bank of America Corporation. In the course of Wachovia's long chain of acquisitions of other financial institutions, many of which were purchased for substantial premiums over book value, it (as its predecessor Acquired Banks had also done) relied increasingly on squeezing more and more revenues and profits from fiduciary operations, including standardizing the investment of fiduciary assets and forcing them, increasingly, into proprietary mutual funds. By way of example, in the year 2002, Mr. Thompson proclaimed $490 million in "targeted efficiencies" and a total of $890 million by the end of 2003, much of which appears to have been at the expense of fiduciary accounts and their beneficiaries.

## JURISDICTION AND VENUE

9.     This Class Action is brought by plaintiff on his own behalf and on behalf of all other members of the Class defined below, arising out of, *inter alia*, breaches of fiduciary duties owed by the defendants to beneficiaries of certain fiduciary accounts for which the Bank serves and/or served as fiduciary.

10.     The substantive claims asserted herein arise under and pursuant to common law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(b), the Class Action Fairness Act of 2005 and 28 U.S.C. § 1367.  The value of the relief sought on behalf of Class members exceeds $5,000,000 exclusive of interest and costs and there is diversity of citizenship between plaintiff, a citizen of Pennsylvania, and each of the defendants. Significant conduct of the defendants as described herein occurred or directly affected transactions within the Commonwealth of Pennsylvania and the Eastern District of Pennsylvania. Further, each of the defendants presently conducts and/or has conducted business within and/or can be found and/or conducted significant business operations within this District during the time period of the wrongdoing alleged herein.  Each of the defendants had continuous and systemic contacts with this District by reason of, *inter alia*, their common scheme, plan and conspiracy set forth below, to foist upon the fiduciary accounts of plaintiff and all members of the Class shares of the proprietary mutual funds of defendants including, in particular, those of the Evergreen Funds.  Accordingly, this Court has personal jurisdiction over the defendants.

12.     Venue is proper in this District as many of the acts and practices complained of herein had their origin in and/or occurred in substantial part in this District. Further, many significant witnesses to the wrongdoing referred to herein are found in and/or did business within this District and will only be available for trial purposes in this District. Plaintiff resides in this District, as do large numbers of the members of the Class.  In addition, a substantial amount of documents relevant to this dispute are located in this District.

13.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets. Each of the defendants, directly and/or through agents, affiliates and/or independent contractors distributed

prospectuses within and otherwise marketed Evergreen Funds shares to members of the Class residing in this District, all of which conduct originated within and/or outside the Commonwealth of Pennsylvania.

## THE PARTIES

14.     Plaintiff Ralph Brooks, Jr. is a citizen of the Commonwealth of Pennsylvania who is the sole beneficiary of the Brooks Trust described above. The Brooks Trust was terminated on or about March 1, 2006.

15.     Defendant Wachovia Corporation is a Delaware holding company which owns the shares of numerous subsidiaries including those of defendant Wachovia Bank, N.A. which, over the last 15 years, has acquired numerous other banks and financial institutions and merged them into it at the direction of, *inter alia*, their respective Chief Executive Officers, Messrs. Thompson and  Baker. Although Wachovia, the successor-in-interest to CoreStates Bank and FUB and their respective parent corporations which were based in Philadelphia, now have their principal places of business in Charlotte, NC, they continue to conduct substantial business within this District including, *inter alia*, employing within this District those persons who served as the various "trust administrators" of the Brooks Trust.

16.     Defendant Evergreen Funds, (the "Business Trust"), is a Massachusetts business trust and is a controlled affiliate of the other defendants.  The Business Trust is nominally controlled by a Board of Trustees pursuant to Massachusetts statutory law and the provisions of the Investment Company Act of 1940. According to the Business Trust, it is governed by a Board of Trustees, a majority of which have nominally been "dis-interested" and elected by its shareholders and/or appointed by the Nominating Committee of the very same Board of Trustees who have effectively "marched" to the Bank's orders. Notwithstanding their beneficial ownership of the shares which would otherwise control the election of defendant Business Trust's Board of Trustees, upon information and belief, Wachovia has taken for itself such voting rights and uses them to*, inter alia*, retain its domination and control over defendant Business

Trust, the identity of its Board of Trustees (including the nominally dis-interested members thereof), the selection of investment advisors to the Evergreen Funds, the Evergreen Funds themselves and otherwise. The Bank, upon information and belief, either holds in its capacity as a fiduciary or otherwise, sufficient numbers of the shares of the various Evergreen Funds that it is a "control person" of the Business Trust as such term is defined under the federal securities laws. The complete domination of the Business Trust and the Evergreen Funds themselves is pervasive. The Business Trust conducts business within this District by means of, *inter alia*, its distribution of prospectuses and other offering materials of the Evergreen Funds family of mutual funds through the Bank and its subsidiaries and sister companies, its marketing and sale of shares of such funds, primarily distributed by and through Wachovia and/or its subsidiaries, agents and independent contractors.  As such, defendant Business Trust has maintained long-standing contacts with and a continuous presence in this District and uniformly entered into contracts with subsidiaries and affiliates of each of the other corporate defendants to provide advisory and other services for the Evergreen Funds, of which contracts plaintiff and the members of the Class are third-party beneficiaries.

17.     At all relevant times, the investment decisions for the Brooks Trust were made by the Bank or entities controlled by its parent, Wachovia, or subsidiaries or affiliates thereof and carried out within this District and throughout the United States.

18.     The Business Trust is the holding/operating entity Wachovia or its corporate predecessors formed to conduct business as what are currently known as the Evergreen Funds, with its principal place of business in Boston, Massachusetts.  Although nominally independent and supervised by its Board of Trustees, defendant Business Trust has at all relevant times been operated as an *alter ego* of defendants Wachovia and the Bank and their respective subsidiaries. Upon information and belief, all the members of the Board of Trustees of the Business Trust were selected and/or approved by the other defendants and

their respective subsidiaries. The Evergreen defendants are corporations wholly-owned by Wachovia and provide various services to the Evergreen Funds, pursuant to which they are paid on a no-bid basis by the Business Trust. Most of the investments and transactions that were carried out for plaintiff and the members of the Class in connection with their fiduciary accounts were consummated in New York.

19.     Defendant Wachovia  (through its subsidiaries) and other business entities not owned by defendant Wachovia individually and collectively, charge substantial fees and expenses to the Evergreen Funds for their purported services which, together with the Business Trust's own operating expenses, have had a substantial cost to plaintiff through the Brooks Trust and to other members of the Class where fiduciary assets have been invested in one or more of the Bank's proprietary mutual funds including, in particular, the Bank's proprietary "money market" funds.

20.     Defendant Michael Scofield ("Scofield") is and has been at relevant times since 1984 Chairman of the Executive Board, Pricing & Litigation Oversight Committees of the Board of Trustees of the Business Trust.  As a result of these positions, he has been responsible for the acts of the Business Trust as described herein, including those within this District.

21.     Defendant Evergreen Investment Services, Inc. ("EISI") is a corporation believed to be directly or indirectly wholly-owned by Wachovia. EISI provides various administrative services to the Evergreen Funds, for which services it is compensated as described herein.

22.     Defendant Evergreen Investment Management Company, LLC ("EIMCO") is a corporation believed to be directly or indirectly wholly-owned by Wachovia. EIMCO provides various investment advisory and other services to the Evergreen Funds, for which services it is compensated as described herein. Certain of the investment advisory services are contracted out by EIMCO to so-called "sub-advisors" who are paid from the foregoing compensation, which is increased sufficiently in order

for EIMCO to be paid a portion thereof even though the actual advisory services to the affected Evergreen Funds are provided by the sub-advisors thereto.

## THE EVERGREEN FUNDS

23.     The Business Trust holds a "family" of more than 90 mutual fund portfolios, which are proprietary funds nominally operated by the Business Trust and its Board of Trustees, including defendant Scofield. The Evergreen Funds and the Business Trust are, in fact, as indicated above, directed and controlled by Wachovia and its subsidiaries. In addition to being controlled by the other defendants, defendant Business Trust and its Board of Trustees had actual and/or constructive knowledge of the circumstances of the wrongdoing committed by the other defendants including, in particular, using the fiduciary assets of plaintiff and the members of the Class to bulk up the Bank's proprietary mutual funds for improper purposes as set forth herein. The acceptance and use of the fiduciary funds of plaintiff and members of the Class to purchase shares of the Evergreen Funds under the circumstances described herein amounted to an acceptance by defendant Business Trust and each of its Trustees, including Scofield, of those assets subject to the pre-existing fiduciary relationship between the Bank and the beneficiaries of the affected Wachovia fiduciary accounts.

24.     Given the intertwined relationship among the defendants with respect to the investment of the assets of the fiduciary accounts of plaintiff and the members of the Class, the knowledge of each of them as to how and why the fiduciary funds were being invested (including the Bank's improper motives) each defendant, including the Business Trust, was and/or is a fiduciary and/or acted in furtherance of the Bank's fiduciary responsibilities. Defendant Business Trust and each member of its Board of Trustees including, in particular, defendant Scofield, was incapable of fulfilling his fiduciary responsibilities due to non-Business Trust obligations and otherwise, knew or should have known that

they were assisting the Bank in breaching its fiduciary duties to plaintiff and the members of the Class and knew as well, that they could not reasonably and responsibly oversee the approximately 90 distinct investment portfolios in their care. At times relevant herein, in conspiracy with Wachovia, its subsidiaries, including Evergreen, EIMCO was selected and/or retained by the Business Trust and its Board of Trustees, each of whom purported to "oversee" at least 90 separate mutual funds, as advisors to the various Evergreen Funds on a "no-bid" basis. EISI and possibly additional subsidiaries of Wachovia were also selected and/or retained on a "no-bid" basis to provide administrative services to the Evergreen Funds and/or to the Business Trust. As such, given the practical impossibility of actually "overseeing" the Evergreen Funds consistent with their fiduciary duties, the Business Trust's Trustees, including defendant Scofield, permitted the advisory fees and other expenses charged to the various Evergreen Funds to be established and maintained by the Business Trust at artificially high levels despite *pro forma* negotiations, all of which was to the disadvantage of the holders of shares of the various Evergreen Funds, including the Brooks Trust fiduciary account and those of the other members of the Class.

25.     In furtherance of such conspiracy with the other defendants, at no time have the Business Trust or its Trustees sought investment advisors or providers of services to the Evergreen Funds other than subsidiaries of Wachovia, other than in certain specialized areas, where sub-advisors were retained or where otherwise necessary, thus unnecessarily increasing the operating expenses of the affected Evergreen Funds, all of which was to the detriment of the fiduciary accounts in the Bank's care.

26.     The Evergreen Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, the Evergreen Growth Fund, the Evergreen Strategic Growth Fund, the Evergreen International Equity Fund and various Evergreen money market funds.

27.     Certain of such Evergreen Funds were funded by the Bank, in substantial part, or "bulked up," by transferring fiduciary assets in its control pursuant to the "Conversions" described below or

otherwise to one or more of Wachovia's proprietary mutual funds described herein. Such funding permitted the affected Evergreen Funds and other proprietary funds to have substantial asset bases, an important selling point to the defendants in marketing shares in the Evergreen Funds to potential retail purchasers thereof through the Bank and other subsidiaries of Wachovia. Indeed, the Bank issued press releases and otherwise proclaimed the successes of its proprietary funds by touting the increases of invested assets therein. The Evergreen Funds selected for investment of fiduciary assets by the Bank were intended , in many cases, to "mirror" the categories of assets held in the Bank's fiduciary accounts prior to the Conversions or of fiduciary assets held in other forms, including assets held in the Bank's Common Trust Funds and/or which were individually invested. Substantially similar or identical Conversions were carried out by Wachovia with respect to the fiduciary assets in which members of the Class had interests which, in plaintiff's case, commenced in late 1998 and continued into 1999. Most of such assets not already in the defendants' proprietary mutual funds were liquidated immediately prior to the various Conversions carried out by the Bank around the country, either as part of so-called "Common Trust Funds" or in individually-managed accounts. However, the over-riding objective of the defendants and Wachovia's predecessor Acquired Banks was the transfer of fiduciary assets, in whatever form, into shares of the Evergreen Funds or others of the Bank's proprietary funds.

28.     Historically, the Bank and its predecessors invested the assets comprising the Brooks Trust account and those of members of the Class primarily through individually managed portfolios or through so-called "Common Trust Funds," as well as stocks, bonds and other assets. In addition, some of the Bank's fiduciary accounts held interests in real estate, businesses and other assets which were also "converted" into shares of the various Evergreen Funds and other proprietary mutual funds. The cost of providing investment and related administrative services to the Bank's fiduciary accounts, pre-Conversion into proprietary mutual funds, was absorbed by the Bank out of the fees it charged for

serving as a fiduciary. Beginning some time prior to 1998, and notwithstanding Wachovia's highly touted and sensible "open architecture" investment philosophy recommended for non-fiduciary accounts at the Bank, in order to, *inter alia,* generate incremental profits from its fiduciary operations and due to massive losses it had incurred from its traditional lending business including those of FUB and, as well, to consolidate and centralize operations of all of the Acquired Banks, including FUB, the Bank and its predecessors, the Acquired Banks, developed various plans and schemes pursuant to which they sought to minimize their operating expenses with respect to fiduciary accounts and maximize their profits from this aspect of their business. Wachovia's plan included the consolidation and elimination of the previously existing trust departments of the Bank, including the Acquired Banks, with the objective of "servicing" fiduciary accounts and the beneficiaries thereof with fewer and fewer personnel, many of whom were and are ill-informed fungible functionaries, the principal function of which was to retain fiduciary assets within the Bank and to pacify complaining beneficiaries of those accounts. Pursuant to such business plans, the Bank decided to utilize the assets within its control and within the control of the Acquired Banks such as FUB, including funds held by the Bank in fiduciary accounts, to fund a group of new Evergreen Funds (some newly formed with no operating history) and/or to add assets to existing Evergreen Funds controlled by the defendants. These mutual funds included the Evergreen Funds as well as other so-called "legacy"mutual funds merged into them which had been previously controlled by the Acquired Banks and other proprietary mutual funds. Thereafter, due to numerous acquisitions, mergers and other transactions referred to above, consistent with their longer-term plan and scheme, the defendants determined that a substantial portion of the assets of the fiduciary accounts held by the Bank (and formerly held as fiduciary assets by the Acquired Banks such as CoreStates and FUB), such as the account of the Brooks Trust, would be converted into shares of certain members of the "family" of Evergreen Funds, the management and investment decisions of which were controlled by Evergreen and

other subsidiaries of Wachovia and/or into shares of other proprietary mutual funds controlled by them (the "Conversions").

29.     Upon information and belief, the Conversions were carried out by senior executives of the Bank due to pressures put on them by the senior-most officers of Wachovia including, *inter alia*, former Chief Executive Officers, Baker and Thompson, as well as Chief Financial Officer, Robert P. Kelly, in order to obtain "targeted efficiencies" of approximately $1 billion, reflecting consolidations of the Acquired Banks, massive lay-offs and reductions of, *inter alia,* fiduciary services. In connection therewith,  senior executives carried out their mandate by providing for the consolidation and centralization of the Bank's fiduciary services by the use of, *inter alia*, proprietary mutual funds to replace to the greatest extent feasible, individually managed investment portfolios for fiduciary accounts. The Conversions were conceived of as a means by which additional revenues could be obtained for the Bank while, simultaneously, closing down or sharply curtailing the trust departments of Acquired Banks and eliminating senior Trust Officers and Portfolio Managers therein and replacing them with relatively low-level and inexperienced personnel. In carrying out Conversions such as those conceived of by Wachovia's senior officers, the Jordan Article counseled:

> "The minutes of meetings of pertinent committees should document the nature and extent of services provided, the expertise of the relevant personnel, the cost of providing the services, comparable fees charged by fiduciaries and non-fiduciaries for money management services and other relevant factors."

Upon information and belief, contrary to the advice put forth by the Bank's counsel therein, such minutes, to the extent they existed at all, were *pro forma* and did not reflect any consideration of the best interests of plaintiff and the members of the Class.

30.     Through a complicated and barely comprehensible  grouping of advisors, sub-advisors, subsidiaries and other affiliated and unaffiliated service providers, including EASI and EIMCO, and

without due regard to the conflicts of interest of the defendants, Wachovia and the Bank engineered a scheme to benefit themselves.  Pursuant to this self-dealing scheme, the Bank effectively co-mingled its fiduciary functions with the other business activities of both the Bank and Wachovia as well as with the Evergreen Funds and the Business Trust, thereby abdicating many of their traditional fiduciary responsibilities, functions and services which they were obligated to provide to beneficiaries of fiduciary accounts. By "crossing the line" in this manner, the Bank's actions resulted in making investments for these fiduciary accounts that resulted in higher total direct and indirect expense charges to the fiduciary accounts as compared to the trustee or similar fees historically paid to the Bank for, *inter alia,* active management of the fiduciary accounts' assets.

31.     Beginning in 1998 and continuing for some time thereafter, as set forth below in greater detail, the Bank and/or the Acquired Banks began sending out standardized form letters informing some co-fiduciaries, beneficiaries of fiduciary accounts and others of the Bank's planned closing of the "Common Trust Funds" maintained by it and/or at its Acquired Banks including those of CoreStates and FUB, and/or otherwise touting the so-called "benefits" of the Conversions, which were then anticipated to take place on a rolling basis pursuant to carefully orchestrated  nationwide plans based, in part, upon the level of integration of the previously Acquired Banks and other factors.

32.     Representative of the Conversions that Wachovia and its various Acquired Banks planned to carry out, at some time prior to April 23, 1999, FUB decided to terminate the CoreStates and Signet Bank (an Acquired Bank) Common Trust Funds and began the process of converting the investments in those Common Trust Funds into shares of certain mutual funds in the Evergreen family of mutual funds. Such termination and Conversion, as with all other Conversions carried out in like manner by the Bank, was intended to benefit FUB by reducing its administrative and other management expenses, increasing non-advisory fees paid to FUB by members of the Class, and achieving some of the economies and efficiencies that were contemplated and economically necessary as a result of FUB's acquisitions of

15

CoreStates and the other Acquired Banks. Indeed, over time, as more and more banks were acquired by and merged into Wachovia, the same process is believed to have been repeated following each such acquisition in part to justify the high premiums being paid for the Acquired Banks. In addition, the large influx of money into the Evergreen Funds would (and did) benefit FUB from the CoreStates Conversion (and the Bank generally as a result of all comparable Conversions carried out by it) by causing the Evergreen Funds to appear to be a rapidly growing family of mutual funds with substantial assets, most of which they would not have but for the "captive" nature of them.   Such Common Trust Fund terminations and Conversions offered no comparable benefits to plaintiff and the other members of the Class, the beneficiaries of the affected fiduciary accounts.

33.    In order to convert the Bank's Common Trust Funds, as FUB desired to do with those maintained by CoreStates, it was necessary for FUB to convince the vast majority of the beneficiaries to go along, and to obtain the consent of each beneficiary or co-fiduciary over whose account FUB did not have complete investment discretion.

34.    There was, however, a risk to FUB that affected beneficiaries/Class members who had at least some control over their fiduciary accounts, upon being notified that the Bank's Common Trust Funds were to be terminated, would explore and choose investment options other than the Evergreen Funds.  In order to persuade the beneficiaries/co-fiduciaries whose consents were required to permit FUB to convert their investments in Common Trust Funds into shares of the Evergreen Funds, FUB promised that the Conversions from the Common Trust Funds to the Evergreen Funds would not result in the affected beneficiaries or their fiduciary accounts incurring any federal capital gains tax as a consequence of the Conversions.

35.    On or about April 23, 1999, pursuant to a project code-named by FUB "Project U2," it sent virtually identical form letters to all the beneficiaries of all the Common Trust Funds, including plaintiff and other members of the Class whose fiduciary accounts were in FUB's care, telling them the "good news" that FUB was terminating certain "legacy" CoreStates Common Trust Funds (and others) and replacing such investments with shares of certain Evergreen Funds. In at least to those members of the Class whose consents to the Conversion was legally required (believed to not include plaintiff),

16

FUB's form letters contained additional language promising that if a beneficiary permitted his or her Common Trust Fund investments to be converted into shares of Evergreen Funds, "[t]his transaction will not result in you or your account incurring any federal income tax."

36.     For those trusts over which FUB did not have complete investment discretion, the letter sought the beneficiaries' written permission to convert their investments in the Common Trust Funds into shares of the Evergreen Funds.  The letter also warned coercively: "If you do not authorize this conversion, your account's investment in the common trust funds will be liquidated, and you or your account may incur federal income tax as a result."  Enclosed with the letter was an "authorization form" and a postage-paid envelope for the beneficiaries whose consents were required to fill out and return to FUB no later than May 21, 1999, in order to accept the offer of a purportedly tax-free Conversion.

37.     In those situations where the consents of co-fiduciaries and/or beneficiaries was required, practically all accepted FUB's offer of a tax-free Conversion in the manner invited by FUB: they filled out the authorization forms and returned them to FUB on or about May 18, 1999. In the case of fiduciary accounts over which FUB had complete investment discretion such as that of plaintiff, no such consents were sought and FUB carried out the CoreStates/Signet Bank Conversions without them.

38.     On or about May 28, 1999, FUB again sent virtually identical letters to all the beneficiaries of all the CoreStates and other Common Trust Funds over whose fiduciary accounts FUB did not have complete investment discretion.  The May 28 letter renewed FUB's offer "to convert your account's common trust fund investments into shares of the Evergreen mutual funds, First Union's family of mutual funds, without you or your account incurring any federal income tax."  Enclosed with the May 28 letter, like the April 23 letter, was an "authorization form" and a postage-free envelope.

39.     In addition, in the May 28 letter, FUB also invited acceptance by silence or inaction:

> If we have not received this form by June 15, 1999, or have not received any written communication from you objecting to the conversion, we will assume that you have authorized this change and proceed to convert the common trust funds held in your account into Evergreen mutual funds. [emphasis in original].

Again FUB warned coercively: "because First Union National Bank will no longer maintain these common trust funds as an investment option for its trust accounts, if you do object to the conversion, your account's current investment in these common trust funds will have to be liquidated and reinvested in alternative investments.  A liquidation of this investment, unlike the conversion into the Evergreen mutual funds, will be subject to federal income tax on any capital gains resulting therefrom."  Upon information and belief, practically all members of the Class who were asked to do so also accepted FUB's offer of apparently tax-free Conversions.  None of the members of the Class or the co-fiduciaries who accepted FUB's offer had any legal duty to perform, or refrain from performing, these acts, which conferred substantial benefits on FUB.  Thus, those members of the Class who "consented" to the Conversions entered into identical contracts with FUB which provided for, *inter alia*, the  purportedly tax-free Conversion of their investments in the CoreStates and other Common Trust Funds. To the best of plaintiff's knowledge, information and belief, in addition to FUB's misrepresentations  of the capital gains tax-free nature of the Conversions, none of its communications disclosed to affected co-fiduciaries or beneficiaries the substantial incremental expenses that would be incurred by these fiduciary accounts as a consequence of their assets being invested in the Evergreen Funds as compared to Common Trust Funds, all of which information was known or could have been known to FUB as well as to each of the defendants prior to the Conversions.

40.     During the period ending on or about July 12, 1999, FUB converted plaintiff's and other Class members' investments in Common Trust Funds into shares of the Evergreen Funds as part of "Project U2."  At or about such time, as an integral part of the Bank's substantially broader plan to build up the Evergreen Funds' asset bases, approximately $ 1 billion in investments in those Common Trust Funds were converted.  Despite FUB's fiduciary duties to the beneficiaries of the fiduciary accounts in its care, and despite the specific, identical contracts into which it had entered with those whose consents to the Conversions were sought, FUB structured the Conversions in such a way that it caused plaintiff and

other members of the Class and/or their fiduciary accounts to incur substantial incremental expenses and tax liabilities, including federal capital gains tax liabilities.

41.     Upon information and belief, other members of the Class also incurred substantial incremental investment-related expenses, including federal income tax liability, as a result of the Bank's Conversions of the Common Trust Funds in which members of the Class held investments into shares of various of the Evergreen Funds.

42.     The Bank's conduct in terminating its Common Trust Funds pursuant to "Project U2" and in other similar "projects" and structuring the Conversions such that members of the Class incurred substantial incremental investment-related expenses and tax liabilities constituted a breach of the fiduciary duties owed by it to plaintiff and the other members of the Class, particularly because the Bank put its own interests, ahead of its beneficiaries' interests in avoiding excessive and unjustified incremental investment-related expenses and tax liabilities and receiving complete and accurate information about the management of their investments.

43.     Indeed, the only apparent reasons for the terminations of the Bank's Common Trust Funds and Conversions were its own interests in consolidating operations, reducing administrative expenses, making more money in non-advisory fees, and building up the Evergreen family of mutual funds, all of which was integral to its acquisitions of financial institutions around the country.  Class members' investments were converted to the Evergreen mutual funds that purportedly had policies and objectives similar to or consistent with those of the corresponding former Common Trust Funds, but with investment-related expenses substantially higher than those that were in effect pre-Conversions.  Neither the Conversions nor the ownership of shares in the Evergreen Funds generally were in the interests of plaintiff and the other  beneficiaries of the Bank's fiduciary accounts.

44.     The Bank's conduct in structuring the Conversions in such a way that plaintiff and the other members of the Class incurred substantial and unnecessary incremental investment-related expenses, including federal income tax liabilities, constituted breaches of fiduciary duty and breach of the identical contracts into which it had entered with the members of the Class.  In those contracts, the Bank, through FUB and otherwise promised plaintiff and the other members of the Class that, *inter alia*, if they

permitted the Conversions of their investments in the Bank's Common Trust Funds into shares of the Evergreen Funds, they would incur no federal income tax liability as a result of the Conversions. The Bank breached those contracts.

45.    Enclosed with the Bank's  various letters sent to, *inter alia*, some beneficiaries of fiduciary accounts, co-fiduciaries, administrators of employee benefit plans and/or managers of foundations were various Evergreen Funds prospectuses and other documents which were drafted so as to conceal the motives of Wachovia and the Bank for the Conversions into their proprietary mutual funds, the benefits of the Conversions to them and their subsidiaries or the increased costs and expenses that would be incurred by the fiduciary accounts as a result of the Conversions. There was no explanation in plain English that would put the recipients of these documents on notice of the Bank's wrongdoing as referred to herein. In fact, the Bank and the lawyers who drafted these documents used such language to conceal the fact that although in many cases there was a credit for certain of the post-Conversion investment advisory fees to be incurred by fiduciary accounts, the credits were insufficient to overcome the substantially higher expenses that fiduciary accounts would bear post-Conversion and that the Bank intended to reduce or eliminate the credit as soon as practicable thereafter once consents were obtained and/or the Conversions completed. Further, there was no credit for the incremental fees and expenses paid directly and indirectly by the fiduciary accounts of plaintiff and other fiduciary accounts beneficiaries against the fiduciary fees charged by the Bank. Additionally, the Bank delayed the application of any such credits until well after EASI, EIMCO and its other subsidiaries which received payment from the Evergreen Funds, thus enriching itself by having the use of such funds during the time period running from when they were received until applied as credits to the fiduciary accounts of plaintiff and members of the Class.

46.    Despite the outward appearance and claimed independence of the Business Trust and its Trustees, including defendant Scofield, and the Business Trust's legal counsel, who may have performed

or been involved with the physical tasks of "drafting" them, the content of the Evergreen Funds prospectuses was effectively dictated by Wachovia, the Bank, their subsidiaries and affiliates.

47.    Apparently as a result of an agreement among the defendants, there were no or inadequate credits provided against the Bank's fees for serving as a corporate fiduciary for the substantial operating expenses of the Evergreen Funds, which substantially reduced the net investment returns to fiduciary accounts, such as the account of the Brooks Trust. At no place in any of the Evergreen Funds prospectuses the defendants issued to beneficiaries of fiduciary accounts in connection with the Conversions or others whose consents were sought by the Bank did they disclose that, post-Conversions, all fiduciary accounts affected by the Conversions would be forced to bear substantially higher investment-related expense levels post-Conversion than those which preceded it, even allowing for whatever credits the Bank applied to its fees for serving as fiduciary. Indeed, upon information and belief, most of such credits, to the extent given,  have now been substantially reduced on a nationwide basis.

48.    Among the duties of a fiduciary such as the Bank is the duty of complete candor in its dealings with the beneficiaries of fiduciary accounts. As advised in the Jordan Article, the disclosure standards by which a fiduciary should be judged are as follows:

> "Were important facts disclosed? Did the trustee misstate important facts? Was the beneficiary told about certain fees? When the disclosures are clear and conspicuous, receipt of the disclosures is acknowledged, preferably in writing, and there are multiple layers of disclosure, through periodic updating, institutions have a much better opportunity to defeat the claims at an earlier, less costly stage….
>
> Fee income from affiliated mutual funds should be clearly disclosed. Recommended steps to ensure proper disclosure include: 1) the distribution of prospectuses to all interested parties upon the initial investment of each fiduciary account in an affiliated mutual fund; and 2) the disclosure of all fees to be received through the mutual funds and the basis on which such fees are calculated in such prospectuses, on the corporate fiduciary's fee schedule, as well as on periodic statements rendered to interested parties of each

fiduciary account invested in the mutual funds. Such disclosures should also be updated on a timely basis if there are any material changes in the information disclosed."

49.     Significantly, at no time did the foregoing "disclosure" documents disclose clearly to a co-fiduciary, a beneficiary or other person interested in the affected fiduciary accounts the true additional direct and indirect expenses of the Conversions they were being asked to approve (although some of such "disclosures" were buried in the Evergreen Fund prospectuses) nor, in fulfillment of the Bank's fiduciary responsibilities, did the Bank make any personal efforts to insure that plaintiff or others similarly situated understood the extent to which the Bank, Wachovia, Evergreen, the Business Trust and its Trustees would benefit from the Conversions and how the plaintiff's account and other fiduciary accounts would end up paying substantially more for the investment and related services that the Bank had historically supplied in partial consideration for the Bank's  fees for serving as a corporate fiduciary.

50.     Upon information and belief, despite its ability to dictate the content of the Evergreen Funds prospectuses, at no time following the foregoing "disclosure" did the Bank make any complete and candid disclosure of the full extent of the damages caused to the fiduciary accounts by the Conversions or other improper investments in the Bank's proprietary funds. Further, the defendants made no disclosure of the true motives of the defendants in carrying out the Conversions or the full extent to which the defendants were profiting unjustly therefrom and, in particular, the additional assets which would flow into the Evergreen Funds and other proprietary mutual funds, making  them more saleable to the investing public generally. Even after the Bank applied a so-called credit against its fees for some portion of the advisory and other fees charged to some of the proprietary funds to some fiduciary accounts, in practical terms, it was (and is) impossible for co-fiduciaries, beneficiaries and others to understand and have knowledge of the true cost of the Conversions to the fiduciary accounts and the income earned upon their assets.

51.     Upon information and belief, no analyses or determinations were made by the Bank as to the suitability and/or propriety of the relative costs and benefits of investments in the defendants' proprietary mutual funds at the time or before the Conversions were carried out for each fiduciary account as compared to pre-Conversion investments including any comparisons with numerous other available mutual funds or investment vehicles in which the Bank could have invested prudently and at lower cost the assets of the fiduciary accounts in which plaintiff and the members of the Class had an interest. Indeed, upon information and belief, the Bank performed no serious analysis comparing the assets of the plaintiff's accounts with the anticipated returns of the various Evergreen Funds in which the assets in such accounts were subsequently invested, which generated greatly reduced returns and higher expenses. Similarly, no such analyses were made by the Bank in fulfillment of its fiduciary responsibilities post-Conversion, which the Bank had a duty to perform on a regular basis. Assets of the fiduciary accounts within the Bank's control thus remained invested in Wachovia's proprietary mutual funds, to the exclusion of most, if not all, others. Even assuming that the Bank made prudent decisions to purchase shares in the Evergreen Funds and other proprietary mutual funds for its fiduciary accounts, upon information and belief, the Bank did not seriously negotiate the fees and expenses to be charged to the Business Trust or the Evergreen Funds (or other of the Bank's proprietary mutual funds) or comparison shop with other funds or families of funds in an attempt to obtain the same or better investment services elsewhere. Similarly, neither the Business Trust nor its controlled Board of Trustees, despite *pro forma* negotiations, sought to obtain the lowest fees from Evergreen or the other subsidiaries of the Bank and Wachovia actually operating and "advising" the Evergreen Funds, nor did they seek lower cost and/or better qualified investment advisors.

52.     Upon information and belief, Wachovia and the Bank specifically excluded alternate investment vehicles (such as other families of funds such as the Vanguard and Fidelity mutual funds)

from their considerations of investments for fiduciary accounts in order to maximize their earnings and those of their corporate affiliates and did not give serious consideration to leaving the assets of fiduciary accounts invested as they were, pre-Conversion, and/or giving beneficiaries of such accounts a choice as to the various alternatives available. Similarly,  with respect to those fiduciary accounts the assets of which were invested in the Bank's Common Trust Funds, at no time did Wachovia and the Bank give any consideration to making changes in the "Common Trust Funds" so as to provide any of the purported "benefits" that the Bank claimed would be forthcoming as a result of the Conversions.

53.     Upon information and belief, as a result of a conspiracy among the defendants and others presently unknown, the Bank and Wachovia, as part of a corporate business decision, chose to invest the fiduciary assets of the Brooks Trust (of which plaintiff is the beneficiary) and the members of the Class in shares of the Evergreen Funds as part of the Conversions and otherwise, as well as, in shares of other proprietary mutual funds in order to generate investment advisory fees and other fees and revenues for Evergreen and their various affiliates and to "bulk-up" the Evergreen Funds and other mutual funds without regard to whether such investments were prudent and in the best interests of plaintiff and the other beneficiaries of fiduciary accounts within the Bank's control.

54.     The foregoing Conversions of the assets of fiduciary accounts to the Evergreen Funds and/or investment of fiduciary assets therein and in other of Wachovia's proprietary mutual funds generally was carried out in furtherance of its corporate plan to reduce the Bank's expenses of managing fiduciary assets consistent with the consolidations of the Acquired Banks that Wachovia contemplated at the times of making each of such acquisitions, necessitated in large part by the substantial premiums it paid to acquire such institutions. and increasing unjustly Wachovia's overall direct and indirect profits from fiduciary operations. Wachovia and the Bank proceeded to carry out the Conversions since they would not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating

additional revenues through Wachovia's related asset management business and otherwise. Additional profit was also generated by investing the assets in the Bank's fiduciary accounts in the Evergreen Funds and in shares of other proprietary mutual funds following the Conversions, thereby making them more saleable at retail to the investing public. Further, the Conversions created an opportunity for the Bank to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which the Bank had contracted to do when it (and/or its predecessors) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income and other revenues directly and through its corporate affiliates.

55. The Bank and its affiliates unjustly reaped many millions of dollars in purported money management, investment advisory and other fees as a result of the Conversions and from the investment of fiduciary assets in the Bank's proprietary mutual funds generally. The Bank also benefited by receiving trustee, personal representative or similar fees for serving as a fiduciary and by reason of the benefits which flowed from, *inter alia*, substantially reduced operating expenses of the Bank's fiduciary operations. Despite these benefits to the Bank and its affiliates, these investments have been of little benefit for the Bank's fiduciary accounts and the beneficiaries thereof, including plaintiff and the members of the Class. On information and belief, all members of the Class suffered damages from the investment practices of the Bank as described above in an amount which cannot presently be determined but which amounts are capable of calculation. It should be noted, however, that plaintiff and other beneficiaries of fiduciary accounts that were required to pay capital gains taxes as a result of the CoreStates /Signet Bank Conversion received certain cash benefits from the settlement of an earlier class action, *Parsky et al v. Wachovia Bank, etc*., February Term, 2000, No 771 (Court of Common Pleas, Philadelphia County) ("*Parsky* Case"). Plaintiff's account at the Bank received $1,364.81 on September

1, 2004 from the settlement of the *Parsky* Case. Upon information and belief, plaintiff neither consented to such settlement or released any claims in connection with it.

56.     Following the Conversions described above or otherwise, Wachovia continued to invest fiduciary assets in its proprietary Evergreen Funds year in and year out without following the advice set forth in the Jordan Article:

> "To demonstrate the continued propriety of investing fiduciary accounts in affiliated mutual funds, the trust department should periodically compare performance and expenses charged by its funds with those of other available mutual funds, and review such performance and expenses in a manner consistent with its review of other investments held by or available to fiduciary accounts generally."

Upon information and belief, notwithstanding the advice of its counsel, Wachovia made no such comparisons to satisfy its fiduciary obligations (including the obligation to invest fiduciary assets prudently) or, if they were made, they were carried out in a perfunctory manner.

## WACHOVIA'S IMPOSITION OF SWEEP FEES

57.     Wachovia and its predecessor Acquired Banks had historically kept idle cash in fiduciary accounts uninvested, thereby keeping for themselves the substantial benefit of the "float" upon which these banks received substantial unearned profits. At a date or dates presently unknown to plaintiff, these banks discontinued keeping such cash "idle," which practices were breaches of the fiduciary duties they owed to the beneficiaries of the affected accounts. In their place, Wachovia and other of its Acquired Banks created and/or purchased computer software which allowed those banks to automatically "sweep" the fiduciary accounts of the cash that was paid in from dividends, interest and otherwise. Upon information and belief, in order to compensate for the loss of the substantial, unearned revenue Wachovia and the Acquired Banks had been receiving from the use of the "idle cash" in fiduciary accounts, Wachovia and the Acquired Banks began imposing so-called "sweep fees" on the accounts measured by the dollars transferred automatically and not the cost of providing this self-described "service." In fact,

Wachovia incurred and incurs no material expense in sweeping fiduciary accounts of cash and the imposition of "sweep fees" is, as one Court in this District found, nothing more than "double dipping." The Jordan Article warned Wachovia that:

> "Under present law, reasonable trustee compensation is determined primarily by an analysis of the labor and services rendered and the responsibility assumed by the trustee."

Indeed, in the wake of the Court's finding in *Packard et al* v. *Provident National Bank, et al,* 799 F.Supp. 540 (E.D.Pa. 1992), rev'd. on jurisdictional grounds, 994 F.2d 1039 (3rd Cir. 1993), it is believed that the Bank's counsel warned it and other banks which imposed "sweep fees" that the continuation of the practice created a substantial risk of a judicial finding that such practice was a breach of fiduciary duty. Even before the *Packard* trial court decision, and continuing thereafter, Wachovia knew or should have known that the charging of such fees to fiduciary accounts was a breach of fiduciary duty since "an analysis of the labor and services rendered and the responsibility assumed" would demonstrate conclusively that "sweep fees" do not amount to "reasonable trustee compensation." In fact, virtually no "labor" is involved in providing fiduciary account sweeping and the only cost of establishing and maintaining the "service" is and was *de minimus*. As such, to the extent that plaintiff and members of the Class herein have been charged "sweep fees" by Wachovia, the Bank has breached its fiduciary duties owed to them and, in the process, has unjustly enriched itself by imposing "[un]reasonable trustee compensation.". The charging of such fees in the wake of the Findings of Fact and Conclusions of Law in *Packard*, where the Court found such "sweep fees" to be "double dipping" and a breach of Mellon Bank's fiduciary duties owed to trust account beneficiaries, put all banks on notice as to the unacceptability of the practice. Indeed, it is the Bank's arrogance and utter insensitivity to the best interests to the beneficiaries of its fiduciary accounts that led it to keep imposing "sweep fees."

## **CLASS ACTION ALLEGATIONS**

## The Relief Sought for Members of the Class

58.     This action is brought by plaintiff, for himself and on behalf of all others similarly situated, under the provisions of Federal Rules of Civil Procedure Rules 23(a) and 23(b)(3) for: (i) an accounting which determines all damages caused by defendants to the members of the Class defined below and the extent of the unjust enrichment of the defendants from their wrongful activities, as well as repayment of such unjust enrichment and the earnings thereupon;  (ii) money damages to be paid by the defendants; (iii) injunctive relief providing for, *inter alia,* the possible removal of the Bank as fiduciary for all fiduciary accounts in which members of the Class are currently beneficiaries; (iv) injunctive relief providing for new procedures and practices at the Bank which put the interests of  members of the Class ahead of those of defendants and which otherwise address the ongoing conflicts of interest faced by the Bank in the investment of fiduciary assets including, *inter alia*, providing for the creation of a so-called "Chinese Wall" separating the Bank's fiduciary functions from all other operations and termination of the imposition of "sweep fees" on fiduciary accounts and/or requiring it to totally "outsource" the actual financial management of the assets in its fiduciary accounts; (v) injunctive relief providing for the Business Trust to provide for the Evergreen Funds and other of the Bank's proprietary mutual funds to annually select investment advisors chosen based upon, *inter alia*,  comparative investment performance and expense; and (vi) for relief  incident and subordinate thereto, including substantial punitive damages, the costs and expenses of this action and an award of attorneys' fees and reimbursement of expenses to plaintiff's counsel.

## Numerosity of the Members of the Class

59.     Upon information and belief, the Bank serves as a fiduciary (such as a Trustee, Guardian, Executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing described herein. The exact number of members of the Class is known by the Bank and is not presently known by plaintiff.

60.     The Class represented by plaintiff consists of all beneficiaries of fiduciary accounts  for which the Bank was corporate fiduciary from the earlier of the Bank's investment of fiduciary assets in any of its proprietary mutual funds or the imposition of "sweep fees" on fiduciary accounts to the present ("Class Period"). The claims of the Class include those arising from, *inter alia*, the imposition of "sweep fees" on fiduciary accounts by the Bank, the incremental expenses of owning Evergreen Funds as a result of the Conversions, the loss of the use of "float" belonging to the members of the Class taken by the Bank for itself and otherwise.  Excluded from the Class members' claims are any claims that were validly released by the settlement of the *Parsky* Case or otherwise.  Such definitions of the Class and the claims of Class members are subject to modification upon completion of discovery with respect thereto.

61.     The exact number of members of the Class as above described is not known by plaintiff, but is within the sole knowledge of the Bank. Upon information and belief, the members of the Class are so numerous as to make a Class Action appropriate.

62.     On information and belief, the members of the Class are located in most or all fifty states, and in numerous foreign countries.

**Common Issues of Law and Fact Predominate**

63.     On information and belief, at least two years prior to the Conversions, the Bank, at the direction of its parent, Wachovia, and in conspiracy with the Business Trust and others, decided to invest the assets of fiduciary accounts in its care in shares of the Evergreen Funds and other proprietary mutual funds, all of which were directly or indirectly "advised" and managed by subsidiaries of defendants Wachovia and the Bank or their affiliates. Such Conversions, such as "Project U2," were carried out nationwide on a rolling basis subject to a master plan developed by the defendants and others including the Acquired Banks. None of such separate Conversions differed materially despite the timing and different locales of each. Upon information and belief, the administrative aspects of each of the

Conversions were carried out by substantially the same groups of employees of the Bank and/or the Acquired Banks, including Michael S. Spangler, the Project Manager of "Project U2," using common form documents, guidelines and operating methodology. Similarly, separate and apart from the formal Conversions, pursuant to directives from senior executives of the Bank, fiduciary assets were increasingly channeled into the Bank's proprietary mutual funds, typically without any material disclosures made to the beneficiaries of the affected accounts that such investments were contrary to their best interests for many of the reasons set forth in this Complaint. At all times within the Class Period, the Bank and/or Acquired Banks imposed "sweep fees" on its fiduciary accounts without any material differences in the computer software used to effectuate such computerized operations, the expense of providing such "service" or any increase in fiduciary responsibility. Indeed, to the extent that Wachovia and the Acquired Banks imposed "sweep fees," such practice represented their belief that their captive fiduciary accounts were "cookie jars" that they could reach into at will.

64.     A fiduciary such as the Bank is obligated to consider each fiduciary account within its care and the needs of the accounts' beneficiaries on an individualized basis including the reasonableness of the Bank's compensation at the trust level. As stated in the Jordan Article:

> "Such fact-specific inquiries may include the gross income of the trust estate, the success or failure of the administration and the results obtained, the unusual skill or experience of the trustee, the time expended by the trustee and the complexity and character of the work performed. The corporate fiduciary also must document costs, including both fixed and incremental costs.
>
> In the end, to support the reasonableness of the fees received, it is critical that the nature of these services and their value be documented. and, such documentation should preferably be performed in a manner that evidences the variations across trust accounts."

65.     Upon information and belief, no such individualized analyses were ever performed for the fiduciary accounts of plaintiff and members of the Class. Indeed, the failure of Wachovia to perform such

individualized analyses or individually determine the assets in which fiduciary accounts should be invested creates Class-wide issues of fact further supporting certification of the Class defined herein.

66.     All members of the Class were adversely affected by the self-serving business decisions of Wachovia and the Bank to invest the fiduciary account assets within the Bank's control into shares of the Evergreen Funds pursuant to the Conversions and/or in their proprietary mutual funds thereafter and/or otherwise invest fiduciary assets therein and/or by being charged, through their fiduciary accounts, "sweep fees".

67.     The Bank's fiduciary accounts, the assets of which were invested in shares of the Evergreen Funds and others of the Bank's proprietary funds, paid directly or indirectly, management and investment advisory fees and other charges to subsidiaries and affiliates of Wachovia. All fiduciary accounts of which the Bank was corporate fiduciary and which had their assets invested in the Evergreen Funds were damaged by reason of the higher expenses charged to such accounts as a consequence of the Conversions and the lower investment returns generated as a result thereof. Even those fiduciary accounts that were not impacted by the Conversions but which had their assets in one or more of the Bank's proprietary mutual funds were damaged by, *inter alia*, not having the benefit of the Bank's objective consideration of what the most appropriate investments were for those accounts. Similarly, all fiduciary accounts were damaged by the Bank's unjustified imposition of "sweep fees" on such accounts.

68.     There are common questions of law and fact that relate to and affect the rights of each member of the Class including, *inter alia*:

(a)     whether, as a corporate fiduciary, the Bank owes and owed fiduciary duties to plaintiff and members of the Class, including a duty of loyalty, a duty of candor, a duty of fair dealing, a duty to avoid self-dealing, an affirmative duty to furnish information and disclose all material facts involving the

31

beneficiaries' fiduciary accounts, and a duty to administer such accounts solely in the beneficiaries' interests, rather than in the Bank's own interests;

(b)       whether the Bank and its Acquired Banks, including FUB, were corporate fiduciaries that held themselves out as experts in investments and financial management;

(c)       whether, as corporate fiduciaries which held themselves out as experts in investments and financial management, the Bank and its Acquired Banks, including FUB,  were required to exercise a higher degree of care in managing fiduciary accounts than would have been required of the average person;

(d)       whether the Bank's business decision to invest assets of the fiduciary accounts in the Evergreen Funds and other proprietary funds was motivated by the best interests of the Class members (which the Bank had a duty to put before its own) or by its desire to generate administrative and investment advisory fees for its affiliates and subsidiaries, to lower the Bank's expenses of managing fiduciary assets and to generate other benefits for themselves by, *inter alia*, "bulking-up" the assets invested in the Bank's proprietary funds;

(e)       whether it was a breach of the Bank's fiduciary duty to impose "sweep fees" on fiduciary accounts for what was no more that an automatic, computerized service that cost the Bank little or nothing to provide;

(f)     whether the Bank breached fiduciary and contractual duties owed to plaintiff and the Class by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act, the guidelines established by the Comptroller of the Currency and other applicable law and regulations;

(g)       whether the defendants breached their respective fiduciary and contractual duties owed to all members of the Class by making investment decisions for the fiduciary accounts of plaintiff and the

Class and/or imposing "sweep fees" on such accounts based upon defendants' own interests and those of their affiliates, rather than the interests of the beneficiaries of such fiduciary accounts;

(h)      whether the Bank, including its Acquired Banks,  breached its fiduciary duties to members of the Class by failing to disclose all the material facts involving the Conversions of their assets into shares of the Bank's proprietary mutual funds and with respect to the Bank's fiduciary accounts generally;

(i)      whether the Bank, including its Acquired Banks, breached its fiduciary duties owed to members of the Class by failing to administer their fiduciary accounts solely in the interests of the beneficiaries thereof;

(j)      whether the Bank, including its Acquired Banks,  breached its fiduciary duties owed to members of the Class by terminating its Common Trust Funds in order to serve its own interests;

(k)      whether the Bank, including the Acquired Banks, breached its fiduciary duties owed to members of the Class by structuring the Conversions in such a way that members of the Class suffered significant negative tax consequences;

(l)      whether the Bank appropriated to itself the benefit of the "float" that was created by the delay between the receipt of fees charged by its subsidiaries and affiliates to the Evergreen Funds and the dates upon which any of such amounts were credited to the Bank's fiduciary accounts;

(m)      whether the Bank's, including its Acquired Banks', conduct constituted self-dealing at the expense of plaintiff and the members of the Class;

(n)      whether the defendants are liable to members of the Class for the damages they suffered due to the Bank's breach of fiduciary duties and otherwise;

(o)      what is the appropriate injunctive relief that is warranted in the circumstances; and

(p)      what remedies are appropriate compensation for the damages caused to plaintiff and each member of the Class.

69.      The relief sought is common to the entire Class including, *inter alia:*

(a)      a declaratory judgment that the Bank violated its fiduciary duty as Trustee (or other similar fiduciary role) with respect to the affected fiduciary accounts and whether it was aided and abetted by the other defendants and others in doing so;

(b)      payment by the defendants of compensatory damages caused by their breaches of fiduciary and contractual duties, as well as substantial punitive damages due to the egregious nature of the wrongdoing committed by them;

(c)      payment by the defendants of the costs and expenses of this action, including the attorneys' fees of plaintiff's counsel;

(d)      an injunction preventing  the Bank from opposing a petition by current beneficiaries of the Bank's fiduciary accounts affected by the Conversions and other wrongdoing referred to herein to replace it as corporate fiduciary;

(e)      an injunction preventing the Bank from imposing "sweep fees" on its fiduciary accounts; and

(f)      an injunction which, *inter alia*, establishes appropriate procedures and safeguards within the Bank and with respect to the operation of the Business Trust to ensure that the interests of beneficiaries of fiduciary accounts within the Bank's control are fully protected from wrongdoing such as described herein.

## **Typicality of Plaintiff's Claims**

70.      The Brooks Trust account and plaintiff, as its beneficiary, have been adversely affected by the wrongdoing of the defendants as described herein.

71.     The assets of the Brooks Trust account, like all other fiduciary accounts, were invested by the Bank in shares of its proprietary mutual funds pursuant to a wholesale business policy decision by Wachovia and the Bank, aided and abetted by the other defendants and/or subjected to the imposition of unjustified "sweep fees" at the behest and encouragement of Wachovia's senior management as means by which Wachovia could, *inter alia*, generate additional and unjustified profits from the Bank's fiduciary accounts and to generate substantial reductions of operating expenses attributable to fiduciary operations.

72.     Upon information and belief, the account of the Brooks Trust, like all other fiduciary accounts, was used by the Bank, the other defendants and their affiliates to generate additional management, investment advisory and/or other fees and benefits for themselves (even after so-called credits were applied to the Bank's fiduciary accounts as a result of certain Evergreen Funds fees were paid to Evergreen, if any) without regard for the best interests of the beneficiaries of such accounts such as plaintiff and the members of the Class.

73.     The claims of plaintiff, who is a representative of the Class, are typical of the claims of all members thereof. The claims of plaintiff are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

### Plaintiff Will Fairly and Adequately Represent the Members of the Class

74.     Plaintiff is able to and will fairly and adequately protect the interests of the members of the Class.

75.     The attorneys for plaintiff are experienced and capable of prosecuting complex litigation such as this case. The attorneys for plaintiff and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

### COUNT I - BREACH OF FIDUCIARY DUTY

76.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.    The Bank owed and has owed fiduciary duties to plaintiff and each member of the Class as defined herein. Each of the other defendants, in addition to having fiduciary obligations to such persons, aided and abetted the Bank in its own breaches of fiduciary duty by, *inter alia*, facilitating the transactions described herein and failing to disclose all material facts with respect thereto to the beneficiaries of the affected fiduciary accounts. In the context of investments for the Bank's fiduciary accounts in proprietary mutual funds, the Jordan Article maintains:

> In evaluating the prudence of such investments, the corporate fiduciary should consider the appropriateness of mutual funds as an investment and the advantages of proprietary funds over third-party funds. **The touchstone issue is the best interests of the beneficiaries**. [emphasis added]

Upon information, if Wachovia followed such advice, at best it did so in a perfunctory manner with a pre-determined outcome; namely, that its fiduciary assets would be invested in its Evergreen Funds and other proprietary mutual funds. The "best interests of the  beneficiaries" were never given any consideration by the Bank in its decisions to carry out the Conversions described herein, to charge their accounts "sweep fees" or to appropriate for itself and unjustly benefit from "float" as described herein.

78.    Upon information and belief, the Bank's decisions to invest the assets of the Brooks Trust and those of the members of the Class in the Evergreen Funds and other proprietary funds and to charge "sweep fees" to fiduciary accounts were motivated not by the interests of plaintiff and the Class members, but by Wachovia's desire to generate investment advisory and other fees for itself and its affiliates and, as well as, to reduce the Bank's operating expenses, all of which as carried out in the manner described above, was wrongful and damaged plaintiff and each member of the Class.

79.     Upon information and belief, in conspiracy with the other defendants, the Bank failed to consider fairly the Bank's proprietary funds' high expenses or alternative lower cost families of mutual funds (or deliberately did not do so) or even maintain the *status quo* when it invested the assets of the Brooks Trust and the accounts of other fiduciary accounts into shares of the Evergreen Funds in connection with the Conversions and otherwise and/or imposed "sweep fees" on such accounts, thus putting its own interests before those of the plaintiff and other beneficiaries of the Bank's fiduciary accounts.

80.     Upon information and belief, in conspiracy with the other defendants, the Bank failed to consider the best interests of the fiduciary accounts of the Brooks Trust and the accounts of other members of the Class when it invested fiduciary assets in the Evergreen Funds and/or charged such accounts "sweep fees" and breached its duty of loyalty to plaintiff and other Class members by putting the interests of itself and its affiliates before the interests of plaintiff and the members of the Class.

81.     The Bank's wholesale investment of the assets of the Brooks Trust and other affected fiduciary accounts in the Evergreen Funds and the Conversions carried out around the country, as well as other investments of fiduciary assets in the Bank's proprietary mutual funds and the imposition of "sweep fees" were breaches of its fiduciary duties owed to plaintiff and the members of the Class, which breaches were aided, abetted and/or directed by the other defendants and their affiliates. Given their role in the Bank's fulfillment of its fiduciary responsibilities to plaintiff and the members of the Class, the acts of the other defendants in connection with the sale of shares of the Evergreen Funds to fiduciary accounts as described herein also constitute breaches of fiduciary duty and/or render such defendants responsible for the Bank's breaches of fiduciary duty..

82.     As a result of, *inter alia*, the Bank's improper wholesale transfer of fiduciary assets held by the fiduciary accounts, including the assets of the Brooks Trust, into shares of the Evergreen Funds

and other proprietary mutual funds, having those accounts charged "sweep fees", and/or being denied the use of "float" as described herein,  plaintiff and other similarly situated beneficiaries of fiduciary accounts for which the Bank was or is a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial and well in excess of $5,000,000.

## COUNT II - BREACH OF CONTRACT

83.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.     By means of the acceptance by the Bank and its predecessors agreeing to act as corporate fiduciary with respect to the Brooks Trust and each of the other fiduciary accounts maintained by the Bank and its predecessors, the Bank committed to provide to all such fiduciary accounts complete investment management services of a corporate fiduciary and render such services on an individualized basis consistent with the goals and objectives of  the creators of the fiduciary accounts and the needs of the beneficiaries thereof . Such obligation of the Bank is an implied and material term in every agreements between the Bank and the creators of fiduciary accounts who appointed the Bank or any of the Acquired Banks as a corporate fiduciary, none of whom anticipated or could reasonably foresee that the Bank would breach its duty of loyalty to the creators of such accounts and their beneficiaries such as plaintiff and the members of the Class in the manner described herein.   Similarly, they could not have foreseen that, in the context of their agreeing with the Bank to act as corporate fiduciary, the Conversions would be carried out by the Bank with fiduciary assets under the circumstances described herein and in such manner as generated income tax liabilities to members of the Class despite the Bank's representations to the contrary,  that the Bank would mishandle fiduciary assets as described herein or that the designated fiduciary would be the Bank in its present form. Plaintiff and the members of the

Class are the beneficiaries of the agreements made between the Bank and the creators of the fiduciary accounts which are the subject of this litigation.

85.     Plaintiff and each member of the Class were and/or are beneficiaries of the Bank's contractual obligations to the creators of the fiduciary accounts described herein and/or are third party beneficiaries to the contractual obligations among the defendants with respect to the investment of fiduciary assets. By abdicating its responsibilities for individual investment management services (in favor of the wholesale investment of fiduciary assets in shares of the Bank's proprietary mutual funds as described herein) that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations thereto. Defendants Wachovia and the Business Trust breached their respective contractual obligations to plaintiff and the Class by aiding and abetting the Bank and/or causing the Bank to act as described above. Further, an implied term of the contracts between and among plaintiff and the Class members and the defendants as referred to herein was that the assets of the fiduciary accounts of plaintiff and the members of the Class would be invested for the primary benefit of such beneficiaries and in a way that would generate the lowest expenses and best returns  consistent with prudent investment practices.

86.     To the extent the Bank made representations to members of the Class and others affected by the Conversions whose consents thereto were sought by the Bank to the effect that such transactions were to be tax-free an d that such representations were accepted by the recipients thereof who provided such consents, a contractual relationship existed based upon such offers and acceptances. When the Bank failed to deliver the tax-free Conversions and related transactions it had promised, it breached its contractual obligations to those members of the Class who provided their consents to the Conversions.

87.     By virtue of the defendants' breach of their respective contractual obligations owed to the members of the Class, plaintiff and the members thereof have suffered damages in an amount to be determined by the Court.

## COUNT III - UNJUST ENRICHMENT

88.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.     By reason of defendant Wachovia's causing the Bank's fiduciary assets in affected accounts to be invested in the Evergreen Funds or other of their proprietary mutual funds, the Bank and Wachovia have "double dipped" and obtained other unjustified benefits as described above including the receipt and retention of unjustified "sweep fees" and retention of "float" as described below. All defendants have profited unjustly by the Conversions, the investment of fiduciary assets in the Bank's proprietary funds and the other acts described herein, including the imposition of unjustified "processing fees", thereby enriching themselves at the expense of plaintiff and the members of the Class. Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the beneficiaries of fiduciary accounts to market various goods and services, including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

90.     Such "double dipping" was carried out by the Bank and Wachovia by imposing on fiduciary accounts the Bank's fees for acting as a corporate fiduciary as well as investment advisory fees, "processing fees" and other related charges which, when taken together with all the Business Trust and Evergreen Funds' expenses, even after so-called credits for certain Evergreen Funds fees (which credits may not have been applied by the Bank in connection with the fees it charged to all of its fiduciary accounts) exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its

Trustee, Executor or similar fees were intended to cover. Such benefits to the Bank and Wachovia were further enhanced by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment and administrative responsibilities owed to the members of the Class. The Bank enhanced its profit performance at the expense of plaintiff and the members of the Class by favoring the use of its own proprietary funds, including the Evergreen Funds, and fiduciary assets within its control to increase the asset bases thereof, and aggrandizing  its own stature, thereby unjustly enriching each of the defendants.

91.     Further, upon information and belief, with respect to at least certain of the fiduciary accounts for which the Bank has acted as corporate fiduciary, the total charges against such accounts for fees/commissions, advisory fees and other amounts payable by the accounts exceed the contractual amounts for such charges agreed upon by the creators of the underlying vehicles for the fiduciary accounts and/or statutory limitations thereof.  The Bank has further unjustly enriched itself by not making timely credits to its fiduciary accounts of the amounts paid by the Evergreen Funds to EASI, EIMCO and other subsidiaries of Wachovia or the Bank. As a result, during the time periods when the Bank had the use of these amounts (or "float") pre-crediting, it not only deprived plaintiff and the members of the Class the ability to have such "float" invested but unjustly enriched itself by investing such "float" and generating income thereupon for itself, which income was not credited back to the affected fiduciary accounts.

92.     The defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the fiduciary accounts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate. Plaintiff and others similarly situated are entitled to recover the defendants' ill-gotten gains and profits therefrom.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER  FOR  RELIEF

**WHEREFORE**, plaintiff respectfully requests on his own behalf and on behalf of all members of the Class:

(a)    certification of this action as a Class Action and appointment of plaintiff and plaintiff's counsel to represent the Class;

(b)    entry of judgment on the claims for breach of fiduciary duty in favor of plaintiff individually and as representative of the other members of the Class and against the defendants and an award of compensatory damages, restitution and punitive damages in favor of plaintiff individually and as representative of the other members of the Class and against the defendants in the amount of damages caused by the defendants' breaches of fiduciary duties;

(c)    entry of judgment on the claims for breach of contract in favor of plaintiff individually and as representative of the other members of the Class against the defendants and an award of compensatory damages in favor of plaintiff individually and as representative of the other members of the Class and against the defendants in the amount of damages caused by the defendants' breaches of contract;

(d)    entry of judgment enjoining  the Bank from opposing any petition filed by  any member of the Class seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e)    entry of judgment compelling the defendants to account for their unjust enrichment and disgorging  the amount thereof (and the profits earned thereupon) to the fiduciary accounts, including

the Brooks Trust account, affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(f)     entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of Wachovia and the Business Trust by, *inter alia,* establishing a so-called "Chinese Wall" for the purpose of effectuating such insulation and/or requiring the Bank to totally "outsource" the asset management aspects of its fiduciary accounts;

(g)     entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including,  *inter alia*, the appointment of an ombudsman to oversee the Bank's fiduciary operations and compelling the Business Trust and the Bank's other operators of its proprietary mutual funds to select annually investment advisors based upon, *inter alia*, comparative investment performance and expenses;

(h)     repayment to the affected Evergreen Funds of the damages caused to them by the defendants' actions as described herein;

(i)      entry of judgment compelling the Bank to cease imposing "sweep fees" on its fiduciary accounts;

(j)      entry of judgment for punitive damages  for plaintiff and  each member of the Class, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

(k)        reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the net recovery to members of the Class; and

(l)        such other or additional relief as this Court deems appropriate.

GREENFIELD &GOODMAN LLC

By:        _____

RICHARD D. GREENFIELD
7426 Tour Drive
Easton, MD 21601
(410) 745-4149
(410) 745-4158 (Fax)
Email:  whitehatrdg@earthlink.net

ANN MILLER, LLC

By:        _____

ANN MILLER
The Benjamin Franklin, Suite 206
834 Chestnut Street
Philadelphia, PA 19107
(215) 238-0468
(215) 574-0699 (Fax)
Email:  am@attorneyannmiller.com
COUNSEL FOR PLAINTIFF AND THE CLASS

March 2, 2006