UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RALPH BROOKS, JR.** on behalf of himself and all others similarly situated, | CIVIL ACTION NO. 06-CV-955 |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| **WACHOVIA BANK, N.A.; WACHOVIA CORPORATION; EVERGREEN INVESTMENT SERVICES, INC.; EVERGREEN INVESTMENT MANAGEMENT COMPANY, LLC.; and EVERGREEN DISTRIBUTORS, INC.** | CLASS ACTION |
| Defendants. | |

AMENDED COMPLAINT

Plaintiff; through his counsel, hereby alleges the following upon personal knowledge as to his own acts and upon information and belief based, among other things, upon the investigation made by plaintiff by and through such counsel as to the acts of the defendants as described herein. The majority of evidence in support of plaintiffs claims is in defendants' exclusive possession, custody, or control. Plaintiffs claims are likely to have additional evidentiary support after a reasonable opportunity for discovery.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C.§ 1964, 28 U.S.C. § 1331 and § 22 of the Securities Act of 1933 ("Securities Act"),

28 U.S.C. § 1332(b), the Class Action Fairness Act of 2005 and 28 U.S.C. § 1367. The value of the relief sought on behalf of Class members exceeds $5,000,000 exclusive of interest and costs and there is diversity of citizenship between plaintiff, a citizen of Pennsylvania, and each of the defendants, all of which are citizens or deemed citizens of other states.

2.      Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. § 1391(b) because each of the defendants had undeniable daily and regular contacts with this District by reason of, *inter alia,* their common scheme, plan and conspiracy set forth below, to foist upon the fiduciary accounts of plaintiff and all members of the Class shares of the proprietary mutual funds of defendants including, in particular, those of the Evergreen Funds, and to extract from such accounts excessive and unjust fees and other benefits.

3.      The plan and scheme by all defendants to unlawfully market Evergreen Funds within the Commonwealth of Pennsylvania was and is an essential, purposeful and integral component of Wachovia's strategy and business plan to be a nationwide financial institution as set forth herein. Accordingly, this Court has personal jurisdiction over all defendants, particularly given their systematic, repeated and continuing contacts with and within this District, including contacts with the other defendants and members of the Class as described herein.

4.      In light of the foregoing substantial contacts with the Commonwealth of Pennsylvania and this District, each defendant can reasonably be expected to be subject to the jurisdiction of this Court, particularly since plaintiff's claims as asserted herein specifically

2

arise from and are directly related to all defendants' contacts with this District as described above.

5.      Venue is proper in this District as well since many of the acts and practices complained of herein had their origin in and/or occurred in substantial part in this District. Further, many significant witnesses to the wrongdoing referred to herein are found in and/or did business within this District and will only be available for trial purposes in this District. Plaintiff resides in this District, as do large numbers of the members of the Class. In addition, a substantial amount of documents relevant to the claims asserted herein including, in particular, documents relating to the sale of Evergreen Funds to plaintiff and the Brooks Trust and numerous other beneficiaries of the Bank's fiduciary accounts, are located in this District.

6.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets. Each of the defendants, directly and/or through agents, affiliates and/or independent contractors distributed prospectuses within and otherwise marketed Evergreen Funds shares to members of the Class residing in this District, all of which conduct originated within and/or outside the Commonwealth of Pennsylvania and this District in particular.

## THE PARTIES

### Plaintiff

7. Plaintiff Ralph Brooks, Jr., 25 years of age, is a citizen of the Commonwealth of Pennsylvania who was the sole beneficiary of the Brooks Trust described herein.

including mortgage banking, investment banking, investment advisory, home equity lending,

asset-based lending, leasing, insurance, international and securities brokerage services,

Yrirn          „I,n:A:--:-. R 7 .7-.7e

hrough ` achovia Securities, LLC, and operates in 49 states, including within the

Commonwealth of Pennsylvania and within this District. Wachovia organizes its business

into four segments: Capital Management, the General Bank, Wealth Management, and the

Corporate and Investment Bank. Wachovia is the parent company of defendants Evergreen

Distributors, Inc., Evergreen Investment Management Company, LLC and Evergreen

Investment Services, Inc.

9.      Defendant Wachovia Bank, N.A., is a wholly-owned subsidiary of Wachovia

and is engaged in commercial and retail banking in Pennsylvania and elsewhere.

10.     Wachovia markets its investment products under the brand name of and

subsidiary, Evergreen Investments. Evergreen Investments is the service mark of defendant

Evergreen Investment Management Company, LLC.

4

11.     Defendant Evergreen Investment Management Company, LLC ("Evergreen Investment") is a broadly diversified asset and investment management organization, with products and services distributed across several lines of business. It serves more than four million individual and institutional investors through a broad range of investment products. Evergreen Investments manages more than $247 billion in assets (as of September 30, 2004).

12.     Evergreen Investment is the investment adviser to the Evergreen Family of Funds. It has been managing mutual funds and private accounts since 1932, and managed over $109.4 billion in assets for the Evergreen Funds as of December 31, 2003. It is a wholly-owned subsidiary of Wachovia.

13.     Defendant Evergreen Distributor, Inc. ("EDI"), a subsidiary of Wachovia, markets the Funds through broker-dealers and other financial representatives. EDI is the principal underwriter for the Evergreen Mutual Funds. Evergreen Mutual Funds have entered into a Principal Underwriting Agreement with EDI with respect to each class of the Funds.

14.     Defendant Evergreen Investment Services, Inc. ("EIS"), a subsidiary of Wachovia, services as the administrator to each of the Funds, subject to the nominal supervision and control of the Funds' Board of Trustees (the "Board of Trustees" or the "Board"), and as distributor of the Evergreen Funds. EIS provides the Evergreen Funds with facilities, equipment and personnel and is entitled to receive annual fees from each of the Evergreen Funds.

15.     EDI and EIS are referred to collectively herein as the "Distributor Defendants." Together Evergreen Investment, EDI and EIS are referred to herein as "Evergreen."

16.     At all relevant times, the investment decisions for the Brooks Trust and other similarly situated fiduciary accounts were made by the Bank or entities controlled by its parent, Wachovia, or subsidiaries or affiliates thereof and carried out within this District and throughout the United States.

**Control Person** Liability

17.     At all relevant times, Wachovia and the Bank were and presently are "control persons" as such term is defined pursuant to the § 15 of the Securities Act and § 20 of the Exchange Act inasmuch as they have the power and authority and exercised the same to totally dominate and control each of the other defendants named herein with respect to the conduct which is the subject of this litigation.

18.     As such, Wachovia and the Bank are responsible for and liable to plaintiff and the members of the Federal Securities Sub-Class defined below for the primary violations of the Securities Act and the Exchange Act by the "controlled persons" as described herein.

## **BACKGROUND** FACTS

19.     This Class Action is brought by plaintiff Ralph Brooks on his own behalf and on behalf of all those similarly situated against the defendants arising out of, *inter alia,* violations of the federal securities and other federal law as well as breaches of fiduciary and/or contractual duty owed to them by defendants. This case is brought against the backdrop of the fundamental fiduciary duties owed by defendants to plaintiff and the members of the Class defined below.

20.     As stated by the Court in *Busby v. Worthen Bank & Trust Co., NA.,* 484 F.

Supp. 647, (E.D.Ark. 1979):

> The dispositive point, in this Court's judgment, is that [the bank] is the trustee of an express trust. As such, **it is subject to what is probably the highest standard of fiduciary duty known to the law. Doubts must be resolved against the trustee, and against its employees, and in favor of the beneficiaries.** The famous passage by Chief Judge (later Mr. Justice) Cardozo, speaking for the New York Court of Appeals, has lost none of its force: ` **Many forms of conduct permissible in a work-a-day world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place.** Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court....' **The trustee has a duty to avoid even the appearance of impropriety...''**

[emphasis added, internal citations omitted]

## Plaintiff's Trust Accounts

21. In 1988, when plaintiff was six years old, he was shot and crippled for life near his home in North Philadelphia. In the wake of such shooting, The Philadelphia Daily News and Power 99 radio station ("WUSL-FM") (collectively "the Sponsors") publicized plaintiff's plight and began to raise funds for his benefit. Ultimately, funds were raised and deposited with a corporate predecessor of the Bank, CoreStates Bank, N.A. ("CoreStates"). Pursuant to an agreement entered into between the Sponsors and CoreStates, on December 12, 1990, a trust account was established for plaintiff's benefit with $81,700 at CoreStates. The account encompassed two funds entitled "Ralph Brooks Educational Fund" and "Ralph

Brooks Medical Fund" (collectively the "Trust" or "Brooks Trust"). The stated purpose of the former was "to provide for the education of Ralph Brooks, Jr.". The latter was entitled variously the "Ralph Brooks Medical Fund" or "Children's Rehab Hospital Trust." Plaintiff had absolutely no discretion with respect to the investments made for him and his Trust by CoreStates and its successors-in-interest, now known as Wachovia Bank. The Brooks Trust account at the Bank was terminated on or about February 27, 2006.


**Wachovia's Goal To Be A Nationwide Financial Giant**

22.     Over the course of the last 15 years, Wachovia has made numerous acquisitions of other financial institutions throughout the United States ("Acquired Banks"), many of which acquisitions were driven by former Chairmen and Chief Executive Officers, H.L. Baker, Jr. and E.E. Crutchfield Jr. and their successor, G. Kennedy ("Ken") Thompson, assisted by their respective subordinates.

23.          According to The Wall Street Journal of May 8, 2006:

> "Wachovia CEO Thompson has built a reputation as one of banking's most acquisitive chieftains, and he has made no secret of his ambition to push Wachovia to ever greater national prominence. Nevertheless, the price that Mr. Thompson has agreed to pay for [Wachovia' s latest acquisition] will likely spark comparisons to his predecessor, Edward E. Crutchfield, Jr., known as "Fast Eddie" for the buying spree he orchestrated when he ran the bank from the 1970s to the late 1990s. Many of the acquisitions were poorly handled, and customers fled in large numbers. In the 1990s, the bank repeatedly reduced earnings estimates, angering investors and losing their confidence."

24. On September 4, 2001, Wachovia and the parent of FUB, First Union Corporation, "completed their merger of equals," as proclaimed in the Bank's press release on such date. This transaction and other similar ones before and after it, reflected the

8

personal objectives of Messrs. Baker, Crutchfield and Thompson to create a nationwide banking franchise and, as well, their personal competition with their fellow Charlotteans, Hugh McColl, Jr. and Kenneth Lewis, who were doing the same thing with Bank of America Corporation.

25.     In the course of Wachovia's long chain of acquisitions of other financial institutions, many of which were purchased for substantial premiums over book value, it (as its predecessor Acquired Banks had also done) relied increasingly on squeezing more and more revenues and profits from fiduciary operations, including standardizing the investment of fiduciary assets and forcing them, increasingly, into proprietary mutual funds.

**The Evergreen Funds**

26.     Given the intertwined relationship among the defendants with respect to the investment of the assets of the fiduciary accounts of plaintiff and the members of the Class, the knowledge of each of them as to how and why the fiduciary funds were being invested (including the Bank's improper motives) each defendant was and/or is a fiduciary and/or acted in furtherance of the Bank's fiduciary responsibilities.

27.     The Evergreen Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia,* the Evergreen Growth Fund, the Evergreen Strategic Growth Fund, the Evergreen International Equity Fund and the Evergreen Core Bond Fund.

28.     Beginning some time prior to 1998, Wachovia developed various plans and schemes pursuant to which it and the Bank sought to minimize the operating expenses with respect to fiduciary accounts and maximize their profits from this aspect of their business.

Wachovia's plan included the consolidation and elimination of the previously existing trust departments of the Bank and the Acquired Banks and by carrying out the Conversions.

29.     Pursuant to such business plans, the Bank decided to utilize the assets within its control, including funds held by the Bank in fiduciary accounts, to fund a group of new Evergreen Funds (some newly formed with no operating history) and/or to add assets to existing Evergreen Funds.

30.     The Bank and its affiliates unjustly reaped many millions of dollars in purported money management, investment advisory and other fees as a result of the Conversions and from the investment of fiduciary assets in the Bank's proprietary mutual funds generally. The Bank also benefited by receiving trustee, personal representative or similar fees for serving as a fiduciary and by reason of the benefits which flowed from, *inter alia,* substantially reduced operating expenses of the Bank's fiduciary operations. Despite these benefits to the Bank and its affiliates, these investments have been of little benefit for the Bank's fiduciary accounts and the beneficiaries thereof, including plaintiff. However, plaintiff makes no claims herein relating to this Conversion.

31.     In the wake of these Conversions, in early 2000, a class action, *Parsky, et al v. Wachovia Bank, etc.,* February Term, 2000, No. 771 (Court of Common Pleas, Philadelphia County) *("Parsky* Case"), was commenced and settled. Plaintiff's account at the Bank was credited the sum of $1,364.81 on September 1, 2004 from the settlement of the *Parsky* Case. Upon information and belief, plaintiff neither consented to such settlement, received any notice of it or personally released any claims in connection with it. Similarly, Wachovia provided no explanation of the reasons why the foregoing amount was transferred

to his account. Further, the settlement of the *Parsky* case, if validly settled at all, at best only released certain then-existing tax-related claims and no others.

### Settlement of the *Parsky* Case

32.     The *Parsky* Case was ultimately settled in July, 2003 on behalf of "all persons **who incurred tax liability** by reason of capital gains from December 1998 through December *1999* on any investment held in any of [9 of the Bank's Common Trust] funds." ( the *"Parsky* Class") The focus of the action brought on behalf of the *Parsky* Class was that FUB handled the Conversions "in such a way as to cause unnecessary capital gains taxes to be paid. ._and that such conduct constituted a breach of [FUB ' s] fiduciary duties to the Class Representatives [therein] and the other members of the *[Parsky* Class]" including, in particular, plaintiff herein. *Parsky* Stipulation of Settlement, July 24, 2003 (the "Stipulation").

33.     Notwithstanding the focus of *Parsky* on tax liability issues, which was also the focus of the Court's Order of May 8, 2001, which granted the plaintiffs' Motion for Class Certification, the Bank demanded and obtained as a condition of the settlement of *Parsky* unwarranted and extremely broad, but wholly ambiguous, language purporting to release the Bank and numerous other unnamed persons and entities from liability not only for past acts but prospectively and for various "known or unknown, suspected or unsuspected" claims.

34.     The release provisions of the Stipulation, at ¶1[22-24, which purported to extend well beyond the tax issues that were highlighted again in the Notice of Proposed Settlement sent to members of the *Parsky Class ("Class* Notice"), were as follows:

> 22. "Released Claims" means each and every direct, individual, class,
> representative, derivative and other claim, right, action, allegation,
> demand, defense, counterclaim, issue, setoff, liability, penalty, and

cause of action of every nature and description whatsoever, **known or unknown, suspected or unsuspected,** including (without limitation) all claims for damages, restitution, disgorgement or rescission, or any other legal or equitable relief, liquidated or unliquidated, which the Releasors, or any of them, had, now has **or may hereafter have** against the Releasees, or any of them, arising from or in connection with or in any way related, directly or indirectly, to any of the acts, facts, matters, transactions, events, occurrences, disclosures, statements, representations, omissions, or failures to act set forth, alleged, referred to or otherwise embraced in this case, including but not limited to claims arising under the statutory or common laws of the United States, the Commonwealth of Pennsylvania or any other state, territory or jurisdiction (whether domestic or foreign), or arising from or in any way related to the Settlement of these Actions, excepting only any claim to enforce the terms of this Settlement Agreement.

23. "Releasees" means Defendant, its predecessors, successors, present and past parents, joint ventures, affiliates, subsidiaries, divisions or other organizational units of any kind, any entity now or in the past controlled by, controlling or under common control with any of the foregoing, the past and present officers, directors, partners, shareholders, employees, agents, attorneys, representatives, beneficial owners, investment advisors, investment bankers, insurers, independent contractors, accountants, heirs, executors, administrators of each of the foregoing, and the predecessors, successors, and assigns of each of the foregoing.

24. "Releasors" means Class Representatives and all Class Members (except for those listed in Exhibits A and B hereto), on behalf of themselves, their past and present partners, officers, directors, agents, attorneys, owners, shareholders, trustees, beneficiaries, parents, subsidiaries, divisions and affiliates and the heirs, executors, administrators, predecessors, successors and assigns of each of the foregoing. [Emphasis added]

35.    Despite the almost unprecedented breadth of such release language, the

Class Notice focused on the tax-related issues in *Parsky* and stated in relevant part:

The plaintiffs, Robert Parsky and Ann Roantree, on behalf of themselves and all others similarly situated, allege that the defendant First Union, breached its duties and promises to the class by

terminating and converting the above-listed common trust funds (the "Class Funds") into shares of First Union's Evergreen mutual funds for First Union's own benefit and **in such a way that its customers — the Class Members here — incurred unnecessary capital gains tax liability.**

Specifically, the plaintiffs allege that: (1) First Union, for its own purposes and advantage, decided to terminate the Class Funds and convert the investments in them into shares of First Union's own Evergreen mutual funds; (2) First Union promised Class Members that, if they permitted First Union to convert their investments, it would "not result in you or your account incurring any federal income tax'" and (3) First Union conducted the conversions in such a way that the Class Members incurred unnecessary capital gains tax liability.

The plaintiffs allege that, as a result of the conversions, First Union caused most of the Class Funds — and thus most Class Members — to incur more capital gains tax liability during the conversion period ( December 1998 to July 9, 1999) than during an average prior period of the same length. Further, the plaintiffs allege that First Union caused unprecedented short-term capital gains to be realized by some of the Class Funds during the conversion period, which (because of the higher rate at which short-term capital gains are taxed) drove Class Members' tax liability still higher. Finally, the plaintiffs allege that, although First Union knew of the unusually large tax liability that its customers had incurred as a result of the conversions, it failed to tell them about it until after December 31, 1999, by which time it was too late for any Class Member to engage in any tax planning to offset or avoid the unexpectedly large tax liability.

The plaintiffs allege that First Union breached its duties of loyalty, candor and fair dealing to Class Members, as well as its duties to avoid self-dealing, to furnish information and disclose all material facts involving trusts under its trusteeship, and to administer those trusts solely in the interests of the trusts' beneficiaries rather than its own interest. The plaintiffs also allege that First Union breached contracts into which it entered with Class Members in which First Union promised that the conversions would "not result in you or your account incurring any federal income tax." The plaintiffs seek to recover from First Union, on behalf of the class, the amounts of any taxes paid as a result of the conversion, as well as attorneys' fees and costs.

Further, as a result of this litigation and in particular the efforts of Class Counsel, it was discovered that an error by First Union had

caused members of the Class invested in the CoreStates Growth
Equity Trust to overpay their federal income taxes in 1999. Plaintiffs
allege that this mistake was a further breach of First Union's fiduciary
duties to these members of the class. [emphasis added]

36.     Not only did the *Parsky* Notice focus the definition of the *Parsky* Class on

the tax-related claims that were being settled, the parties reinforced this "message" by

highlighting the respective damages analyses made by their respective experts as follows:

Again, the alleged damages in this case are not the "excess"
capital gains themselves, but rather the taxes paid on them. Dr.
Barclay found that the taxes paid on the "excess" gains totaled
more than $39 million. First Union's expert, Anthony B. Creamer
III of Navigant Consulting, found the damages to be only $7
million, in large part because he concluded that most of the "
excess" taxes would have been paid eventually anyway.

37.      Thus, a member of the *Parsky* Class, if he had even been provided with a

copy of the Class Notice, could not and would not have been sufficiently informed as to

whom (other than the Bank) was being released for what claims (other than those arising

from having to pay capital gains taxes) over what period of time.

38.      Notwithstanding the excessively broad and inappropriate language of the

Stipulation and the material insufficiency of the Class Notice, which amounted to a denial of

due process to the members of the *Parsky* Class, including plaintiff, its proponents presented

it to the Court of Common Pleas of Philadelphia County, which approved it as presented by

the parties.

39.      Thereafter, the Bank paid into the Brooks Trust account and to other

affected fiduciary accounts the balance of the approximately $23 million in settlement

benefits created by *Parsky* after fees and expenses. As such, if any of the *Parsky* claims were

validly released, which plaintiff alleges they were not, the release would only cover the tax-

claims against the Bank.

40.     Upon information and belief, despite the Bank's obligation pursuant to the *Parsky* Settlement and as required in the exercise of its fiduciary duties and due process, the *Parsky* Notice was not provided by the Bank to all members of the *Parsky* Class and it was not provided to plaintiff.

**Sales of Evergreen Funds Shares To Wachovia's Fiduciary Accounts**

41.     Throughout the Class Period defined below, defendant Wachovia Bank purchased and sold shares of various Evergreen Funds for plaintiff's trust account including, but not limited to the following purchase and sales in September, October and November, 2005 which resulted in losses to plaintiff's account when the account was liquidated in February, 2006:

| Date | Transaction Description |
|------|-------------------------|
| 09/22/05 | Purchased 1.972 units Evergreen Core Bond Fd Inst CL (FD #474) on 09/25/05 at 10.63 |
| 10/24/05 | Purchased 2.394 units Evergreen Core Bond Fd Inst CL (FD #474) on 10/21/05 at 10.52 |
| 10/24/05 | Sold 2.384 units Evergreen Core Bond Fd Inst CL (FD #474) on 10/21/05 at 10.52 |
| 11/22/05 | Purchased *1.456* units Evergreen Core Bond Fd Inst CL (FD #474) on 11/21/05 at 10.46 |

Similarly, the Bank purchased Evergreen Funds for all or practically all its fiduciary accounts, including accounts which have or had co-fiduciaries. In the course of carrying out such purchases, the Bank intentionally excluded from consideration alternate, lower cost, better managed non-proprietary mutual funds.

## FACTS UNDERLYING THE VIOLATIONS OF FEDERAL AND COMMON LAW

### **Wachovia's** Imposition of Sweep Fees

42.     Wachovia and its predecessor Acquired Banks had historically kept idle cash in Fiduciary accounts un-invested, thereby keeping for themselves the substantial benefit of the "float" upon which these banks received substantial unearned profits. At a date or dates presently unknown to plaintiff, these banks discontinued keeping such cash "idle," which practices were breaches of the fiduciary duties they owed to the beneficiaries of the affected accounts. Notwithstanding such breaches of fiduciary duty, plaintiff makes no claim herein with respect thereto.

43.     In their place, Wachovia Bank and other of its Acquired Banks created and/or purchased computer software which allowed those banks to automatically "sweep" the fiduciary accounts of the cash that was paid in from dividends, interest and otherwise. Upon information and belief, in order to compensate for the loss of the substantial, unearned revenue Wachovia and the Acquired Banks had been receiving from the use of the "idle cash" in fiduciary accounts, Wachovia and the Acquired Banks began imposing so-called "sweep fees" on the fiduciary accounts of plaintiff and the members of the Sweep Fees Sub-Class defined below.

44.     The Pennsylvania Probate, Estates and Fiduciaries Code, 20 Pa. C.S.A. §7207(b) expressly permits a fiduciary to make temporary investments of funds it may hold uninvested and to charge a **reasonable fee** to the extent it is justified.

45.     With respect to the Brooks Trusts, however, the Bank imposed "sweep fees" which were measured by the dollars transferred automatically and not the cost of providing this self-described "service" and were, therefore, not reasonable.

46.     The Bank's charge to plaintiff's account was not for the making of temporary investment of funds but was, rather, an additional revenue-generating device, and scheme. The Bank separately charged additional fees to plaintiff's account by having funds placed in the Wachovia PT Money Market account.

47.     The "sweep fees" arbitrarily and unilaterally charged by the Bank to plaintiff's account as of the first business day of every month and to the members of the Sweep Fees Sub-Class were and are unreasonable because Wachovia incurred and incurs no material expense in sweeping fiduciary accounts of cash.

**The Bank's Relationship To Fiduciary Account Beneficiaries**

48.     Wachovia markets itself as a sophisticated trustee with "over a century of experience in trusts, estate planning and wealth management." As the excerpts below illustrate, Wachovia's national advertising campaign focuses almost exclusively on the Bank's superior and purportedly customized trust and fiduciary account management.

> Choosing A Wealth Manager . . . we have a personal perspective on what's important to you – which enables us to develop and execute a plan tailored to you particular objectives and challenges . . . (cited in the June 2005 edition of *Worth* Magazine)
>
> [Trust Services:] Preserve your legacy by maximizing the value of your estate through objective guidance. http://www.wachovia. com/wealth/page/0,,31,00 .html

' *See www.wachovia.com/wealth/page/0,, 32-102,00.html.*

17

TRANSFERRING WEALTH . . . . Our experienced specialists will deliver customized solutions based on your needs, including financial, state and tax planning as well as trust, investment and insurance services. (cited in the May 2005 edition of Worth.)

[W]e provide you with an objective and holistic analysis of your personal financial situation that is tailored to help you grow and preserve wealth. htt .://www.wachovia.com/wealthh a_ e/0 29 00.html.

A team of specialists, led by your Relationship Manager, brings you into a wide range of customized solutions and exclusive services. *Id.*

Our new ads demonstrate that we are objective, proactive and trustworthy. Wachovia wealth management has the clients' best interest at heart." *PR Newswire Association,* May 4, 2004 release *Wachovia Wealth Management Debuts New TV Commercials During Wachovia Championship; Broadcast ads next step in award-winning campaign.*

49.     Wachovia holds itself out as possessing a degree of skill greater than that of an individual of ordinary intelligence. Accordingly, Wachovia is held to that higher degree of skill when evaluating its management (or in this case, lack thereof) of the trusts at issue here.[2]

**Under Federal Regulations Wachovia Owes the Highest Fiduciary Duty to the Trust Beneficiaries**

50.     Trustees are bound by the highest standards of fiduciary duty. For that reason, much guidance exists to inform trustees of the extent of their fiduciary obligations.

51.     For example, recognizing the inherent dangers prevalent when a bank acts as a trustee, The Office of the Comptroller of the Currency (the "OCC") has set up stringent guidelines to ensure that banks do not breach fiduciary duties owed to beneficiaries of trusts and other fiduciary accounts under their management. In that regard, the OCC directs:

Investment of fiduciary accounts – (1) In general. Unless authorized by applicable law, a national bank may not invest funds of a fiduciary account for which a national bank has investment discretion in the stock or obligations of, or in assets acquired from: The bank or any of its

18

directors, officers, or employees; affiliates of the bank or any of their directors, officers, or employees; or individuals or organizations with whom there exists an interest that might affect the exercise of the best judgment of the bank. 12 C.F.R. § 9.12(a).

52. As a follow up to the limitations on the investments that may be made by a bank as set forth in 12 C.F.R. § 9.12(a), the OCC released: Acceptance of Financial Benefits By Bank Trust Departments Comptroller of Currency—Banking Issues B-233, *Chief Executive Officers of National Banks Authorized to Exercise Fiduciary Powers, Deputy Comptrollers (District), and Examining Personnel,* February 3, 1989, which states in pertinent part:

FIDUCIARY DUTIES OF BANK TRUST DEPARTMENTS

National bank trustees owe exacting fiduciary duties to customers who place trust funds under the bank's management. **Trustees are obligated to make decisions concerning the investment of trust assets based exclusively on the best interest of trust customers.** This principle is reflected in 12 C.F.R. § 9.12(a) ... .

When selecting a mutual fund or money market investment, a trustee should evaluate the return being paid, the composition and length of maturities of its portfolio, the fund's management and all other factors relevant to the suitability of the investment for customers. ***The trustee must not place themselves in a position where their judgments concerning the optimal investment for trust accounts may be influenced by the trustees' receipt of financial benefits for selecting a particular investment. The same principles apply whether the bank (i) rebates or discounts services provided by or at the direction of an investment management firm (such as accounting and administrative services), (ii) computer goods or services, (iii) seminars and travel expenses which are offered by, or at the direction of such firms, or (iv) any other financial benefits in exchange for investing trust funds in particular money market funds.***
\* \* \*

***In sum, if a bank receives incentives for placing trust assets in an investment fund offered by a particular provider, the bank must pass those incentives on to the accounts which have had their asset interests invested in the fund.***

REMEDIAL ACTION

**National banks that engage, or have engaged, in conduct inconsistent with their fiduciary duties may be subject to significant liability for fiduciary breaches of these duties.**

[Emphasis added].

53.     The language contained in both 12 C.F.R. § 9.12(a) and the OCC's directive contemplate that the Bank must conduct an analysis and evaluation of whether its fiduciary obligations to beneficiaries are affected by the transactions it mandates and to what extent its judgment may be compromised by its own interests. Wachovia did not conduct such an objective analysis, clearly engaged in self-dealing and completely abrogated its fiduciary obligation to actively and independently analyze and monitor fiduciary account assets. Indeed, the actions of Wachovia and the Bank were driven purely by their desire to maximize their profit rather than by the Bank's obligations to the beneficiaries entrusted to it.

54.     The Board of Governors of the Federal Reserve System in its February 26, 1997, Supervision and Regulation letter SR 97-3 (SPE) similarly analyzed Wachovia's obligations when investing assets under management in its own proprietary funds either in connection with Conversions or otherwise:

> In determining whether to convert common trust funds to mutual funds, a banking organization must address the possibility that the conversion could result in conflicts between the best interest of the organization and the best interests of its fiduciary customers. The banking organization must also determine that the mutual fund shares are suitable for accounts which previously held common trust fund units. Banking organizations that convert or transfer common trust funds to mutual funds may face questions from current and future beneficiaries with respect to those two issues.
>
> Potential conflicts can arise if a banking organization were to charge a direct fee to the trust customers for serving as trustee while also charging an advisor's fee to the mutual fund . . . it may appear that the

organization's primary motive for conversion was a self-interest in generating greater fee income.

**Another possible conflict of interest could arise from the use of proprietary mutual funds when there are unaffiliated mutual funds or alternate investment opportunities available that may be equally appropriate for the participants' portfolio.** Again, the appearance that the organization put its own interests above those of its fiduciary customers may cause concern particularly if investments are made in a newly established proprietary fund with no history or track record.

[emphasis added]

55.     Here, the Bank mandated investment of fiduciary assets in its care in proprietary mutual funds — the Evergreen Funds — when there were and are unaffiliated mutual funds (such as low-expense ratio Vanguard Funds or Fidelity Funds) or alternate investment opportunities that were available to the Bank's fiduciary accounts and which were at least equally appropriate for the participants' portfolios.

## Wachovia Failed to Exercise Any Standards of Prudent Investment

56.     A fiduciary such as the Bank is obligated to invest and manage trust assets as a prudent investor would, in light of the purpose, terms, distribution, requirements, and other circumstances of the trust. This requires a fiduciary to exercise reasonable care, skill and caution before investing trust assets. As such, a fiduciary must always incorporate risk and return objectives reasonably suitable to that particular trust.[2]

57.     In addition, a fiduciary must always:

a. abide by the fundamental fiduciary duty of loyalty;

b. act with prudence in deciding whether and how to delegate authority and when

---

[2] *See* Restatement (Third) Trusts §§ 227 (1992).

      c.  incur  only  reasonable  and  appropriate  costs  for  the  trustees'  investment responsibilities.

58.     In general, trustees such as the Bank have a fiduciary obligation to comply with the terms of the trust agreements and other underlying instruments creating the fiduciary relationship. The fiduciary must also adhere to fundamental duties as outlined above. An evaluation of whether or not a fiduciary has breached its obligations to those in its care is judged at the time of the investment decision in question. Thus, the question of whether the Bank breached its fiduciary duties turns on the prudence of its original conduct, not on the hindsight analysis of the eventual results of its decision.

59.     Plaintiff and other members of the Class have suffered harm as a result of the Bank's breaches of fiduciary duty as described in this Complaint. Indeed, when plaintiff's account was closed in February, 2006, plaintiff incurred long and short term capital losses on the Core Bond Funds, one of the Evergreen funds in his portfolio.

60.     In addition, a fiduciary such as the Bank owes a duty of undivided loyalty to a beneficiary entrusted to it and must administer a trust or other fiduciary account solely in the interest of the account's beneficiaries. The strict adherence to this duty prohibits a fiduciary from investing in or managing investments in a manner that gives rise to an undue profit from a personal conflict of interest. If a fiduciary, by virtue of his or her disloyalty to a beneficiary, generates an undue profit (like Wachovia did through, *inter alia,* the collection of trustee's fees, the collection of "other expenses" and the collection, directly or indirectly, of profits resulting from the purchase and sale of Evergreen Funds), the beneficiary is entitled to recover that profit, as well as the fees paid to the fiduciary.

22

61.     Further, the duty of care requires a fiduciary to exercise reasonable effort and diligence in making and monitoring investments of the assets in its care, paying particular attention to the objectives of the fiduciary relationship.

> The Trustee must give reasonably careful consideration to both the formulation and the implementation of an appropriate investment strategy, with investments to be selected and reviewed in a manner reasonably appropriate to that strategy. Ordinarily this involves obtaining relevant information about such matters as the circumstances and requirements of the trust and its beneficiaries, the contents and resources of the trust estate, and the nature and characteristics of available investment alternatives.

> [I]f the trustee, such as a corporate or professional fiduciary, procured appointment as a trustee by expressly or impliedly representing that it possessed greater skill than that of an individual of ordinary intelligence, or if the trustee has or represents that it has special facilities for investment management, the trustee is liable for a loss that results from the failure to make reasonably diligent use of that skill or of those special facilities. *See* Restatement (Third) Trusts § 227, cmt. d.

62.     Clearly, in this case, the Bank, by investing the assets of the Brooks Trust account and other accounts similarly situated in Evergreen Funds, did not undertake an account-by-account analysis in order to insure that its investment decisions were consistent with the circumstances and requirements of the various fiduciary accounts and their beneficiaries, the contents and resources available and the nature and characteristics of all appropriate investment alternatives.

63.     Instead, the Bank, consistent with its overall nationwide corporate policy, uniformly applied its mandate that trust assets (including, in particular, those in *all* irrevocable trust accounts) be invested in Evergreen Funds. By virtue of its wholesale abrogation of its fiduciary obligations and its failure to act as a prudent investor would, the Bank breached its fiduciary duties and damaged all members of the Class.

23

64.     In addition to fundamental principles of fiduciary law which the Bank violated as described herein, Wachovia and the Bank violated the "Mission and Guiding Principles" they proclaim to their customers, employees and vendors, as well as to the members of the public:

> **+We maintain a level playing field in selection of external vendors and service providers.**
> **+We seek transparency of costs to understand the true impact of... options.**
> **+ We seek open and frank communication and maintain credibility...We are uncompromising in our principles...**
>                    *                    *                    *
>
> **+We work...to identify and act upon opportunities to improve our products and services while reducing costs.**
>                    *                    *                    *
>
> **+We will examine all reasonable alternatives in order to select and structure relationships that ensure that services...consistently meet or exceed Wachovia's standards.** [ emphasis added]

65.     Notwithstanding the conduct of the defendants as described herein, Ken Thompson, Wachovia's present Chairman and Chief Executive Officer, proclaims at the start of its Code of Conduct and Ethics (the "Code"):

> **Wachovia is committed to uncompromising integrity. We do what we say. We communicate with candor. We admit our mistakes. We are people who take pride in our trustworthiness. Integrity is key in action as well as intention.** (emphasis supplied.)

66.     Similarly, the Code goes on to set out Wachovia's purported standards for ethical conduct, which, as the conduct described herein, is honored in the breach:

> **+Truth and honesty are essential to us...**
> + Simply stated, the Code requires that **what we always do is right... +**
> **Wachovia's ethical standards require honesty and fair dealing...** +
> We will **communicate with candor... [and) deal fairly** with
> Wachovia's customers...
> + No employee, officer or director may take unfair advantage of another
> through manipulation, concealment, abuse of privileged information,

misrepresentation of material facts, or any other intentional unfair-dealing practice. In short, we should do what we say we will do and must communicate honestly and ethically in serving our customers and conducting business with others...

+ **We, of course, must comply with all of the various laws, rules and regulations that apply to Wachovia...because Wachovia is a financial institution engaged in banking...and other regulated businesses...** + Whether certain conduct, a relationship or a transaction is a conflict of interest, or may create a potential conflict of interest, may not always be clear. Any employee or officer who has a question whether a conflict might develop, is obligated to promptly seek assistance to resolve ethically the conflict or question...

+ **Wachovia is committed to full, fair, accurate, timely and understandable disclosure in public reports and documents filed with, or submitted or provided to, regulatory authorities, stockholders and the public...**

[emphasis added]

67.     Evergreen Investment also purports to comply with a Code of Ethics which, it states, "reinforces the company's commitment to the fundamentals of ethical conduct, as defined by the SEC: openness, integrity, honesty and trust." In fact, at all times relevant herein, Evergreen Investment has failed to operate pursuant to such fundamentals of ethical conduct.

**Wachovia's Fiduciary Account Management**

68.     On September 2, 2001, First Union Corporation ("First Union") merged with Wachovia. While the deal was characterized as a merger of equals in the proxy statement, it was really of purchase of Wachovia by First Union. As an important part of the deal, First Union was able to shed its discredited name and assume Wachovia's identity. This strategic move was done in part to help First Union regain customer confidence, because Wachovia's reputation was far better than its own.

69.     As an offshoot of the merger, Wachovia created a separate so-called Wealth Management Division, charged with managing, *inter alia,* trust and other fiduciary accounts under

the Bank's control such as the Brooks Trust account. Stanhope A. Kelly took charge of the new division stating that "[t]he wealth management business will be a focus of the new company as an engine of high growth ...." [3] Today, Wachovia, through its Wealth Management Division, has effectively become the largest trust company in America.[4]

70.     As described in detail throughout this Amended Complaint, Wachovia's Wealth Management Division and, upon information and belief, the senior officers of the Bank, required fiduciary account assets to be invested in Evergreen Funds and, to the greatest extent possible, kept this "investment strategy" a secret from the beneficiaries of such accounts.

**The Bank's Improper Investment of Fiduciary Assets in Evergreen Funds**

71.     Contrary to its fiduciary obligations, the Bank did not undertake an individualized monitoring and analysis of its irrevocable trust assets periodically in order to protect the interests of such trusts' beneficiaries such as plaintiff. Instead, the Bank devised a scheme to maximize its own profits by forcing irrevocable trusts' assets to be invested exclusively in Wachovia's proprietary Evergreen Funds, without regard to whether the investment in its proprietary Evergreen Funds was in the best interests of these trusts or their beneficiaries. In reality, the Bank failed to undertake any analysis whatsoever as to whether the Evergreen Funds were prudent investments, particularly as compared to lower cost, better managed non-proprietary mutual funds. Wachovia's Wealth Management Division is not a "proactive", "customized" and "objective" trust department but, rather, it serves as a means to funnel assets into the Evergreen Funds and otherwise generate unjustified and unjust profits for each of the defendants named herein. As a result, the beneficiaries of the Bank's fiduciary accounts, expecting to receive unbiased and independent asset management

---

[3] http://www.wachovia.com/inside/page/0,,134_307_348_1272_1280"21,00.html [4]
http:www.wachovia.com/inside/page/0,,131_5153^927,00.html

as contemplated by the underlying instruments such as that governing the Brooks Trust, instead were force-fed the Bank's surreptitious "Evergreen Funds policy."

72. The Bank's "Evergreen Funds Policy" consisted of an internal Bank-wide mandate that its officers responsible for fiduciary account portfolio management invest *all* irrevocable trust assets in shares of Evergreen Funds. Wachovia indoctrinated its officers in its "true" Evergreen Fund investment philosophy through its massive corporate campaign and accompanying road show presentations. In the road show presentations, Wachovia Bank fiduciary account administrators and portfolio managers were ordered to invest 100% of irrevocable trust assets in shares of Evergreen Funds. The presentations also mandated that such Evergreen Fund investment requirement was to be considered "firm until further notice." A Powerpoint presentation made to Bank officers stated:

Product Rules

- Evergreen and Sub-Advised Managers are available in most [investment] categories
- Portfolios $ 1-5 million in size will use mostly Evergreen
  - 70% Evergreen/30% Sub-Advised per account
  - Exceptions will be allowed on a very limited basis
- Portfolios ?$5 million in size may use up to 60% in Sub-Advised
- Discretionary trusts (irrevocable) should be 100% Evergreen

Those Rules should be considered firm until further notice.

Balancing Growth in Our Firm's AUM & Choice

Executives of Wealth and CMG Have Agreed:

- Evergreen and Sub-Advised Managers are available in most categories
- Portfolios $1 — 5 million in size will use mostly Evergreen
  - 70% Evergreen/30% Sub-Advised per account
  - Exceptions will be allowed on a very limited basis
- Portfolios ?$5 million in size may use up to 50% in Sub-Advised
- Discretionary trusts (irrevocable) should be 100% Evergreen

73.     The Bank, disregarding its fiduciary duties, continued to improperly collect monthly fees for serving as a corporate fiduciary without providing any corresponding fiduciary services, instead robotically feeding irrevocable trust assets into Evergreen Funds, which fees should all be returned to plaintiff and the members of the Class. Similarly, pursuant to the foregoing "Evergreen Funds Policy" of the Bank, it also forced Evergreen Funds on other fiduciary accounts as indicated above.

74.     The Bank also covered-up its self-dealing through an additional mandate that was disseminated to its trust officers as part of its road show. Specifically, the Bank taught trust officers how to avoid answering questions posed by beneficiaries of the affected fiduciary accounts regarding the "Evergreen Funds" program. Specifically, the Bank cautioned its trust officers that disclosing its Evergreen Fund requirement could create an "unintended bad impression" by causing beneficiaries to feel that they have "to settle for Evergreen products." A Powerpoint presentation made during Wachovia's road show stated:

Strategy for Discussing Manager Capabilities

- •     Avoid telling a client about our 70/30 target mix
  - o   Creates an unintended bad impression
  - o   Makes the client feel they have to "settle" for Evergreen products
- •     Emphasize Portfolio Strategies full range of services
  - o   Reiterate the value we bring in investment strategy and asset allocation
  - o   Establish Evergreen as a highly competitive asset manager
  - o   To enhance our ability to build customized solutions, we also have carefully selected Strategic Partners to round out our capabilities
- •     Avoid showing the "Manager List"
  - o   Can lead to losing control of the sales situation
  - o   Places the focus on managers rather than asset allocation

75.     To make matters worse for the affected fiduciary account beneficiaries, Evergreen Funds have regularly underperformed in comparison to other independent mutual funds, i.e.,

unaffiliated mutual funds. Thus, the Bank's Evergreen Fund initiative was not — and could not be — driven by its beneficiaries' best interests. Instead the Evergreen Fund campaign was driven by the desire of Wachovia and the Bank to exponentially increase investments in proprietary mutual funds and thereby increase their advisory and other fees based on assets invested in the Evergreen Funds.

76.     Furthermore, by forcing the assets of fiduciary accounts to be invested in the Evergreen Funds in lieu of individual management of these accounts or of Common Trust Funds, the Bank was also able to greatly reduce the number of trust administrators, portfolio managers and other personnel, thereby reducing the operating expenses related to its provision of services as a corporate fiduciary.

**Other Expenses**

77.     To add insult to injury, the Bank also "double dips" by charging irrevocable trust beneficiaries' accounts such as that of plaintiff fees at both the mutual fund and trust levels — for managing the same assets. Specifically, the Bank and Wachovia charge to beneficiaries' accounts fees to manage fiduciary assets entrusted to the Bank's care as well as, through Evergreen, investment advisory and administrative fees to manage the same assets once invested into Evergreen Funds. Although, the Bank purports to "credit" investment management/advisory and administrative fees to plaintiff and other Class members, such crediting is a farce, as Evergreen secretly charges investment management/advisory fees to the Evergreen Funds in the form of " other expenses." In any event, such credits, when given at all, are materially less than the increased expenses of investing fiduciary assets in the Evergreen Funds as compared to what they would be if the Bank had itself managed the assets or, if outsourced, had done so to those vendors most qualified at the lowest cost.

78.     The only "disclosure" of what "other expenses" consist of is in Evergreen Funds prospectuses — which are not disseminated to many of the beneficiaries of the Bank's fiduciary

accounts and were not provided to plaintiff Such "disclosure," however, is not made in a manner and in language that is readily comprehensible to beneficiaries.

79.     "Other expenses" are charged to the Evergreen Funds at varying rates by Evergreen and other vendors. Evergreen Funds prospectuses define "Other Expenses" as attendant fees for Evergreen Funds, including:

> miscellaneous fees from affiliated and outside service providers. These may include legal, audit, custodial and safekeeping fees, the printing and mailing of reports and statements, automatic reinvestment of distributions and other conveniences for which the shareholder pays no transaction fees

80.     Had the Bank continued to invest the assets of the Brooks Trust and those of other fiduciary accounts internally, none of the advisory and administrative fees or "Other Expenses" would have been incurred by plaintiff and the members of the Class. Similarly, had the Bank fulfilled its fiduciary duties to plaintiff and the members of the Class in connection with the selection of mutual funds as an alternative to asset management in-house, it would not have selected the Evergreen Funds, but would have chosen better managed, lower cost non-proprietary funds in their place. Accordingly, the Bank is charging improper investment management/advisory and administrative fees while concurrently charging fiduciary service fees to manage the same assets and, as well, obtaining additional unjust benefits from investments of fiduciary assets in the Evergreen Funds.

81.     Indeed, Wachovia and the Bank use "Other Expenses" and the fees directly charged to the Evergreen Funds by Evergreen as additional profit centers without providing concomitant benefits to the affected accounts or their beneficiaries such as plaintiff, all in violation of applicable regulations.

## CLASS ACTION ALLEGATIONS

**The** Relief **Sought for** Members **of the Class and** Sub-Classes

82. This action is brought by plaintiff, for himself and on behalf of all others similarly situated, under the provisions of Federal Rules of Civil Procedure Rules 23(a) and 23(b)(3) for: (i) an accounting which determines all damages caused by defendants to the members of the Class and Sub-Classes defined below and the extent of the unjust enrichment of the defendants from their wrongful activities, as well as repayment of such unjust enrichment and the earnings thereupon; (ii) money damages to be paid by the defendants; (iii) injunctive relief providing for, *inter alia,* the possible removal of the Bank as fiduciary for all fiduciary accounts in which members of the Class are currently beneficiaries; (iv) injunctive relief providing for new procedures and practices at the Bank which put the interests of members of the Class ahead of those of defendants and which otherwise address the ongoing conflicts of interest faced by the Bank in the investment of fiduciary assets including, *inter alia,* providing for the creation of a so-called "Chinese Wall" separating the Bank's fiduciary functions from all other operations and termination of the imposition of "sweep fees" on fiduciary accounts and/or requiring it to totally "outsource" the actual financial management of the assets in its fiduciary accounts; (v) injunctive relief providing for the Business Trust to provide for the Evergreen Funds and other of the Bank's proprietary mutual funds to annually select investment advisors chosen based upon, *inter alia,* comparative investment performance and expense; and (vi) for relief incident and subordinate thereto, including substantial punitive damages, the costs and expenses of this action and an award of attorneys' fees and reimbursement of expenses to plaintiff's counsel.

**Numerosity of the Members of the Class**

83.     Upon information and belief, the Bank serves as a fiduciary (such as a Trustee, Guardian, Executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing described herein. The exact number of members of the Class is known by the Bank and is not presently known by plaintiff although, upon information and belief, plaintiff alleges that there are at least 5,000 members of the Class. Upon information and belief, the affected fiduciary accounts collectively have assets of more than $300 billion.

84.     The Class represented by plaintiff consists of all beneficiaries of fiduciary accounts for which the Bank was corporate fiduciary whose assets were invested by the Bank in Evergreen Funds. Those members of the Class whose fiduciary accounts were subjected to the imposition of "sweep fees" are referred to herein as the "Sweep Fees Sub-Class." Those members of the Class who have or had shares of Evergreen Funds purchased for their fiduciary accounts, which shares were issued and sold pursuant to Evergreen Funds Registration Statements filed with the SEC, are referred to herein as the "Federal Securities Sub-Class." Those members of the Class who have or had irrevocable trusts over which Wachovia has or had complete investment discretion are referred to herein as the "RICO Sub-Class." There are more than 1,000 members of each such Sub-Class. Plaintiff is a member of each of these Sub-Classes.

85.     The Class Period runs from the earlier of the Bank's investment of fiduciary assets in any of its proprietary mutual funds or the imposition of "sweep fees" on fiduciary accounts to the present. The claims of the Class and the Sub-Classes include those arising from, *inter alia,* the imposition of "sweep fees" on fiduciary accounts by the Bank, the Bank's double-dipping and the loss of the use of "float" belonging to the members of the Class taken by the Bank for itself and otherwise. Excluded from the Class and Sub-Class members' claims are any claims that were validly

released by the settlement of the *Parsky* Case, no longer valid due to the expiration of applicable statutory limitations periods or otherwise. Such definitions of the Class and the claims of Class members are subject to modification upon completion of discovery with respect thereto.

86.     As indicated above, the exact number of members of the Class as above described is not known by plaintiff, but is within the sole knowledge of the Bank. Upon information and belief, the members of the Class are so numerous as to make a class action appropriate.

87.     On information and belief, the members of the Class are located in most or all fifty states, and in numerous foreign countries.

## Common Issues of Law and Fact Predominate

88.     Upon information and belief, no such individualized analyses were ever performed for the fiduciary accounts of plaintiff and members of the Class. Indeed, the failure of the Bank to perform such individualized analyses or individually determine the assets in which fiduciary accounts should be invested creates Class-wide issues of fact further supporting certification of the Class defined herein.

89.     All members of the Class were adversely affected by the self-serving business decisions of Wachovia and the Bank to invest the fiduciary account assets within the Bank's control into shares of the Evergreen Funds and/or by being charged, through their fiduciary accounts, "sweep fees".

90.     There are common questions of law and fact that relate to and affect the rights of each member of the Class including, *inter alia:*

(a)     whether, as a corporate fiduciary, the Bank owes and owed fiduciary duties to plaintiff and members of the Class, including a duty of loyalty, a duty of candor, a duty of fair dealing, a duty

33

to avoid self-dealing, an affirmative duty to furnish information and disclose all material facts involving the beneficiaries' fiduciary accounts, and a duty to administer such accounts solely in the beneficiaries' interests, rather than in the Bank's own interests;

(b)  whether, as corporate fiduciaries which held themselves out as experts in investments and financial management, the Bank was required to exercise a higher degree of care in managing fiduciary accounts than would have been required of the average person;

(c) whether the Bank's corporate business decision to invest assets of its fiduciary accounts in the Evergreen Funds was motivated by the best interests of the Class members (which the Bank had a duty to put before its own) or by its desire to generate administrative and investment advisory fees for its affiliates and subsidiaries, to lower the Bank's expenses of managing fiduciary assets and to generate other benefits for themselves by, *inter alia,* "bulking-up" the assets invested in the Bank's proprietary funds;

(d)  whether it was a breach of the Bank's fiduciary duty to impose "sweep fees" on fiduciary accounts for what was no more that an automatic, computerized service that cost the Bank little or nothing to provide;

(e) whether the Bank breached fiduciary and contractual duties owed to plaintiff and the Class by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act, the guidelines established by the Comptroller of the Currency and other applicable law and regulations;

(t) whether the defendants breached their respective fiduciary and contractual duties owed to all members of the Class by making investment decisions for the fiduciary accounts of plaintiff and the Class and/or imposing "sweep fees" on such accounts based upon defendants' own interests and those of their affiliates, rather than the interests of the beneficiaries of such fiduciary

accounts;

($^{g}$) whether the Bank appropriated to itself the benefit of the "float" that was created by the delay between the receipt of fees charged by its subsidiaries and affiliates to the Evergreen Funds and the dates upon which any of such amounts were purportedly credited to the Bank's fiduciary accounts;

(h)      whether the Bank's conduct constituted self-dealing at the expense of plaintiff and the members of the Class;

(i)      whether defendants have violated the federal securities laws;

(j)      whether RICO and other federal laws have been violated as provided herein;

(k)      whether the defendants are liable to members of the Class for the damages they suffered due to the Bank's breach of fiduciary duties and otherwise;

(1)      what is the appropriate injunctive relief that is warranted in the circumstances; and

(m)      what remedies are appropriate compensation for the damages caused to plaintiff and each member of the Class.

91.      The relief sought is common to the entire Class including, *inter alia:*

(a)      a declaratory judgment that the Bank violated its fiduciary duty as Trustee ( or other similar fiduciary role) with respect to the affected fiduciary accounts and whether the other defendants and others actively participated in doing so;

(b)      payment by the defendants of compensatory damages caused by their breaches of fiduciary and contractual duties, treble damages with respect to the claims asserted in Count I hereof, as well as substantial punitive damages due to the egregious nature of the wrongdoing committed by them;

(c)     payment by the defendants of the costs and expenses of this action, including the attorneys' fees of plaintiff's counsel;

(d)     an injunction preventing the Bank from imposing "sweep fees" on its fiduciary accounts; and

(e)     an injunction which, *inter alia,* establishes appropriate procedures and safeguards within the Bank to ensure that the interests of beneficiaries of fiduciary accounts within the Bank's control are fully protected from wrongdoing such as described herein.

**Typicality of Plaintiff's Claims**

92.     The Brooks Trust account and plaintiff, as its beneficiary, have been adversely affected by the wrongdoing of the defendants as described herein.

93.     The assets of the Brooks Trust account, like all other fiduciary accounts, were invested by the Bank in shares of its proprietary mutual funds pursuant to a wholesale business policy decision by Wachovia and the Bank, in which the other defendants participated, and/or subjected to the imposition of unjustified "sweep fees" at the behest and encouragement of the Bank's senior management as means by which Wachovia could, *inter alia,* generate additional and unjustified profits from the Bank's fiduciary accounts and to generate substantial reductions of operating expenses attributable to fiduciary operations.

94.     Upon information and belief, the account of the Brooks Trust, like all other fiduciary accounts, was used by the Bank, the other defendants and their affiliates to generate additional unnecessary and unjustly charged management, investment advisory and/or other fees and benefits for themselves without regard for the best interests of the beneficiaries of such accounts such as plaintiff and the members of the Class.

36

95.     The claims of plaintiff, who is a representative of the Class, are typical of the claims of all members thereof. The claims of plaintiff are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

**Plaintiff Will Fairly and Adequately Represent the Members of the Class**

96.     Plaintiff is able to and will fairly and adequately protect the interests of the members of the Class.

97.     The attorneys for plaintiff are experienced and capable of prosecuting complex litigation such as this case. The attorneys for plaintiff and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

<u>COUNT I</u>
<u>RICO</u>

98.     This Count is brought in the alternative to the claims set forth in Counts II and III on behalf of plaintiff and the members of the RICO Sub-Class against Wachovia and the Bank.

99.     This Court has jurisdiction over the subject matter of this claim pursuant to 18 U.S.C.§ 1964 for plaintiff's claim arising under 18 U.S.C. §§ 1961-1968 ("RICO").

100. Venue is proper in this District under 18 U.S.C. § 1965(a) because Wachovia and the Bank reside, are found, have an agent and transact their affairs in this District.

101. Defendant Wachovia and the Bank are each persons within the meaning of 18 U. S.C. § 1961(3).

102. At all relevant times, there has been and continues to be an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). The Enterprise consists of

at least the Bank, Wachovia, Evergreen Investment, EDI and EIS as well as the members of the Evergreen Funds Board of Trustees. At all relevant times, the Enterprise has been and continues to be engaged in and its activities have affected, and continues to affect, interstate commerce.

103. The Enterprise is separate and distinct from Wachovia and the Bank and from each of the other members of the Enterprise. The Enterprise exists to advance the interests of each of the defendants and, through them, Wachovia and the Bank.

104. Wachovia and the Bank have conducted the affairs of the Enterprise throughout Pennsylvania and other locations and within this District, through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961 (1) and (5). Defendants herein had the authority to and did direct and control the operation and management of the affairs of the Enterprise with respect to all aspects of administration of the plaintiff's and RICO Sub-Class members' fiduciary accounts including investments for such accounts and charging of fees paid by plaintiff and the members of the RICO Sub-Class. By so conducting the affairs of the Enterprise, Wachovia and the Bank have violated 18 U.S.C. § 1964(c), and are liable to plaintiff and the members of the RICO Sub-Class for three times the injury caused under 18 U.S.C. § 1964.

105. The pattern of racketeering activity consists of multiple acts indictable under 18 U.S. C. § § 664, 1341 and 1343 including, *inter alia,* mail and wire fraud. These acts were carried out repeatedly and continuously from at least 1997 and are continuing. These racketeering acts are related because they had a common goal, used similar means, and had common victims – plaintiff and the other RICO Sub-Class members. The racketeering activity of defendants and the other members of the Enterprise pose a threat of continuing racketeering activity in that they are part of the regular way of doing business of the Enterprise, and have extended over at least 9 years, have injured

38

thousands of victims in addition to the plaintiff, and continue to injure irrevocable trusts and other fiduciary accounts administered by the Bank as well as the beneficiaries of these accounts.

106. As part of the pattern of racketeering activity, beginning at least in 1997 and continuing to the present, defendants herein have directly and indirectly, by use of the means and instrumentalities of interstate commerce, including the mails and wires, employed manipulative and deceptive devices and contrivances, among other things, to induce settlers such as the Sponsors and other persons who established fiduciary accounts at the Bank and the Acquired Banks to engage the Enterprise to provide fiduciary account investment and administrative services for a fee, to fraudulently conceal and misrepresent the actual amounts paid to the Enterprise for investment and related services, to cause the plaintiff and RICO Sub-Class Members to pay Wachovia and the Bank through the other defendants, substantial sums of money for investment and other services in excess of what such services were actually worth, and to engage in self-dealing at the expense of the members of the RICO Sub-Class.

107. Indeed, such payments were not made voluntarily by plaintiff and the members of the RICO Sub-Class; rather, the Enterprise looted their accounts unilaterally in various direct and indirect ways. It accomplished this result by employing artifices and schemes to defraud, making false and misleading statements, and engaging in acts, practices and courses of business that would and did operate as a fraud and deceit on plaintiff and the members of the RICO Sub-Class, and enabled defendants herein and the other members of the Enterprise to defraud beneficiaries of fiduciary accounts, all in violation of 18 U.S.C. §§ 664, 1341 and 1343.

108. This pattern of racketeering activity includes, but is not limited to: (a) the dissemination of quarterly trust account statements such as those specified in paragraph 118 below provided through the use of the mails by the Bank to plaintiff and the other members of the RICO

Sub-Class, which statements misrepresented at least (i) the actual amount of fee credits, the manner in which they were calculated and what they were intended to cover; (ii) the actual amount of the fiduciary fees charged by the Bank, including other direct and indirect benefits paid to or received by the members of the Enterprise; (iii) the actual amount of the "sweep fee" as well as why they were imposed and that the Bank incurred no expense in carrying out such "sweeping"; and (iv) otherwise systematically defrauding plaintiff and other members of the RICO Sub-Class by withdrawing there from other fees and expenses, directly and indirectly, through the Evergreen Funds which expenses were avoidable and unnecessary given the Bank's obligations to plaintiff and the members of the RICO Sub-Class.

109. In addition to the documents referred to above, some of the false and misleading documents disseminated to plaintiff are, *inter alia:*

| Document Title | Approximate Date of Mailing and/or Wire Transmission of Information Contained in Documents |
|---|---|
| Wachovia Trust Statement to plaintiff in care of Kimberly Brooks | November 30, 2004 |
| Wachovia Trust Statement to plaintiff in care of Kimberly Brooks | December 1, 2005 |
| Summary of Income and Principal Transactions | February 27, 2006 |

110. Each of the above listed documents contain information and statements relating to plaintiffs trust account including the fees paid by the account which are materially false, misleading or omitted to state material facts necessary to render such statements true and the time they were made. The falsity of each such statement is set forth, *inter alia,* in paragraphs 115-117 above.

111. Plaintiff and the members of the RICO Sub-Class relied to their detriment on the false statements set forth herein and have suffered damages in an amount to be proven at trial. Had they not so relied on the honesty and candor of the Bank and not believed in the accuracy and

completeness of the written communications from the Bank, they would have sought the resignation of the Bank as corporate fiduciary or pursued their legal rights including the commencement of litigation.

112. As a direct and proximate result of the foregoing violations of 18 U.S.C. § 1964(c), plaintiff and the members of the RICO Sub-Class were injured in their business and property in an amount which cannot presently be calculated and, also, should recover treble such damages and the costs of this suit, including attorneys' fees.

## COUNT II

## THE SECURITIES ACT

113. Plaintiff, who at all relevant times during his purchases of Evergreen Funds shares, was without knowledge of the material misstatement and omissions of material facts set forth herein, reasserts and realleges each and every allegation set forth in the paragraphs above as if stated herein on behalf of himself and the Federal Securities Sub-Class.

114. The claims asserted herein, which are not fraud-based and are distinct from the claims set forth in Count III hereof, are asserted in the alternative to those in Count I hereof. The claims asserted herein are asserted within one year of being discovered by plaintiff and within three years from the sale to plaintiff and the Brooks Trust account shares of Evergreen Funds since June 2, 2003. At no time prior to the commencement of this litigation did plaintiff have knowledge of the wrongdoing.

115. As described above, the defendants and the "controlled persons" of Wachovia and the Bank, including the members of the Evergreen Funds Board of Trustees, caused Registration Statements on Form N-lA and Post-Effective Amendments thereof to be filed with the SEC which contained, *inter alia,* Evergreen Funds prospectuses which were disseminated to members of the

Federal Securities Sub-Class, which prospectuses misrepresented material facts and omitted other material facts as described above.

**The False Registration Statements and Related Amendments**

116. On September 1, 2005 (Evergreen Core Bond Fund), December 1, 2005 (Evergreen Special Value Fund) and February 1, 2006 (Evergreen Growth Fund) and on other dates relevant hereto, the defendants and certain "controlled persons" including the Trustees of the Evergreen Funds, caused the Evergreen Funds to file Registration Statements with the SEC on Form N-1-A as well as Post-Effective Amendments thereto, each of which documents incorporated Evergreen Funds prospectuses. Each of such Registration Statements and Post-Effective Amendments became effective and, in connection therewith, the Evergreen Funds sold shares therein through Evergreen as well as other "controlled persons" of Wachovia and the Bank.

117. Each of the foregoing Registration Statements and Post-Effective Amendments contained misrepresentations of material fact and omitted material facts regarding, *inter alia:* (1) the relationships between and among the defendants hereto; (2) the control exercised over the Evergreen Funds and its Board of Trustees by Wachovia and the Bank; (3) the necessity for the fees and expenses charged to fiduciary accounts as a result of the offering which would not have been incurred by the affected fiduciary accounts but for being forced to invest in Evergreen Funds; and (4) the failure of the Board of Trustees to seek asset managers and other providers of services to the Evergreen Funds based upon quality and cost, as compared to their relationship to Wachovia and the Bank.

118. Further, such Registration Statements and Post-Effective Amendments failed to disclose that the shares of the Evergreen Funds registered and sold pursuant thereto were being sold mostly to fiduciary accounts in the Bank's care, that the Bank, in light of such fact, voted the

majority of the outstanding Evergreen Funds shares to exercise its total control and domination of the Evergreen Funds Board of Trustees.

119. These Registration Statements and Post-Effective Amendments also failed to disclose that among the risk factors faced by investors in Evergreen Funds was the risk that, because its Board of Trustees selected and contracted with Evergreen to provide investment management and administrative services on a "no-bid" basis, Evergreen Funds were being charged excessive fees for such services and because the Board of Trustees was not objective in its selection of investment advisers to the Evergreen Funds, shareholders were not able to obtain the most qualified personnel and the lowest cost consistent with such quality.

120. By way of example, the Evergreen Funds prospectus contained in its September 1, 2005 Registration Statement for the Evergreen Core Bond Fund, disclosed various material risks to be faced by investors therein including plaintiff and members of the Federal Securities Sub-Class. Notwithstanding the risks that were disclosed, such prospectus failed to disclose the material risk that, because of the relatively high expense structure of this fund (and indeed, all Evergreen Funds) as compared with the expenses of the Bank's direct investment of the invested assets, the affected fiduciary accounts would have materially lower yields (i.e. net income) from such investment than if the Bank had invested the assets of these accounts directly in the identical bonds bought by the Evergreen Core Bond Fund.

121. Similarly, at page 5, *et seq* of such prospectus, in discussing the historical and likely performance and fees and expenses faced and to be faced by investors therein, the defendants and/or their "controlled persons" failed to disclose therein the true aggregate "Total Return" for the shares of the Fund since it did not reflect the net effect of the other charges imposed by the Bank as a fiduciary, which had the effect, even after deduction of so-called "credits" against the Bank's fees, of

lowering the net return of the assets invested.

122. Such prospectus also similarly misrepresented the totality of all fees and expenses borne by the invested assets since, in effect, the defendants were "double dipping", even after " credits" applied by the Bank against its direct fees.

123. The above-referenced prospectus also fails to disclose that the services obtained by the Evergreen Funds from Evergreen Investment are obtained on a no-bid basis and that the Board of Trustees specifically excluded from consideration other providers of the same services that are better managed and lower cost.

124. In discussing "Other Fund Practices," this same prospectus failed to disclose that this and other Evergreen Funds were subject to unexplained levels of turnover by the Bank in effectuating purchases and sales of Evergreen Funds shares, none of which accrued to the benefit of plaintiff or the other beneficiaries of the Bank's fiduciary accounts.

125. In discussing "Fund Governance," at page 36 of the above-referenced prospectus, no disclosure is made of the material fact that despite the purported independence and " disinterestedness" of a majority of the Board of Trustees of the Evergreen Funds, the Bank, by its control of the Trustee election process through its abrogation to itself of the proxies rightly belonging to plaintiff and members of the Class, in fact controls the Trustees themselves.

126. Similarly, at page 39 of the same prospectus, where "Proxy Voting" is discussed, the prospectus omits any reference to the voting of the proxies of the Evergreen Funds themselves or how or why the Bank exercises and votes the majority of proxies itself and in its own interest.

127. The prospectus also fails to disclose that the Trustees oversee at least 90 different Evergreen Funds and, as a result thereof, although there are certain efficiencies and cost savings to such Funds, the net effect is that the Trustees do not have the time or inclination to oversee each of

the Evergreen Funds individually and determine what are the most advantageous contractual arrangements for each of such funds for the benefit of their respective shareholders, including plaintiff and the members of the Class. Further, because of the compensation package provided to each of the Evergreen Funds Trustees is determined and approved by the defendants, the Trustees are beholden to them and cannot deal with and do not deal with their fiduciary and other responsibilities objectively.

128. Each of the foregoing misrepresentations and/or material omissions is typical of those of the other Evergreen Fund prospectuses issued and disseminated during at least the last three years in that each of them contain what their drafters regard as common "boilerplate."

129. The defendants were either directly or through their "controlled persons" underwriters, issuers, offerors, solicitors of sales and or selling shareholders with respect to the Evergreen Funds shares sold under and pursuant to the foregoing Registration Statements and Post-Effective Amendments and/or signers thereof through "controlled persons."

130. Each of such defendants and their "controlled persons" was capable of and did in fact cause Evergreen Funds to sell the Evergreen Funds shares issued pursuant to the Registration Statements and Post-Effective Amendments referred to herein.

131. Each of the defendants and their "controlled persons" were provided with or had unlimited access to the foregoing Registration Statements and Post-Effective Amendments prior to and/or shortly after these documents were filed with the SEC and had the power to prevent the filing, issuance and dissemination of the Evergreen Funds prospectuses therein and/or cause the statements therein to be corrected.

132. Wachovia dominated and controlled each of the other defendants and their officers and the Trustees of the Evergreen Funds who were the signatories to the foregoing SEC filings, all of

which were "controlled persons" under and pursuant to § 15 of the Securities Act. As such, Wachovia and the Bank were and are responsible for the statements made by or in the name each of the other defendants, their officers and the Evergreen Funds Board of Trustees as described above. Each of the defendants, directly and through their "controlled persons" and their respective legal counsel not only participated in the sale of Evergreen Funds shares but participated in the preparation of the false and misleading Registration Statements and Post-Effective Amendments referred to above.

133. As a result thereof, and the scheme of which the issuance and filing with the SEC of the foregoing Registration Statements and Post-Effective Amendments thereto were an integral part, Wachovia and the Bank, through the other defendants and other "controlled persons" caused Evergreen Funds shares to be issued and sold to plaintiff's fiduciary account and those of the members of the Federal Federal Securities Sub-Class, all of which was in violation of §§ 11 and 12 ( a)(2) of the Securities Act, all of which caused them damages in an amount which cannot presently be determined for which damages each of the defendants is jointly and severally liable. Members of the Federal Securities Sub-Class who still hold such shares covered by this Count and have sustained losses thereupon hereby demand that the Bank hereby tender (and they hereby do tender) those shares and seek the recovery of the consideration of such shares. Plaintiff and the remaining members of the Federal Securities Sub-Class seek recissory damages.

## COUNT **HI**

## **THE EXCHANGE** ACT

134. Plaintiff reasserts and realleges each and every allegation set forth in the paragraphs above as if stated herein on behalf of himself and the Federal Securities Sub-Class. The claims

asserted herein, which are separate and distinct from the non-fraud-based claims asserted in Count II hereof, are asserted in the alternative to those in Count I hereof.

135. As described above, Wachovia, through the other defendants of which it was a " control person," caused the dissemination of false and misleading prospectuses and other documents which concealed material facts and misrepresented other material facts in connection with the purchase and sale of Evergreen Funds shares by and for plaintiff and the members of the Federal Securities Sub-Class. Such sales of Evergreen Funds shares were integral to the defendants' scheme and plan to unfairly and fraudulently extract unjust fees and other income from plaintiff and the members of the Federal Securities Sub-Class.

136. Wachovia and the Bank dominated and controlled each of the other defendants and the Trustees of the Evergreen Funds, all of whom were "controlled persons" under and pursuant to § 20 of the Exchange Act. As such, Wachovia and the Bank are and were responsible for the statements made by or in the name of each of the other defendants, the Board of Trustees of the Evergreen Funds and the Evergreen Funds themselves as described above.

137. Despite the fact that defendants and each of such other "controlled persons" had a duty to disseminate to plaintiff and members of the Federal Securities Sub-Class accurate and truthful information to the beneficiaries of the Bank's fiduciary accounts as to the manner in which the Evergreen Funds were operated and selected, the manner in which vendors of investment advisory and other services were selected and the existence of excessive expenses to be borne by the Bank's fiduciary accounts in connection with their ownership of Evergreen Funds shares, such persons failed to fulfill such duty. Each of them carried out the plan and scheme described herein intentionally to enrich Wachovia and the Bank at the expense of plaintiff and the members of the Federal Securities Class. Each misrepresentation of material fact and/or omission of material facts

described herein was either made with reckless disregard for, or knowledge of, its false and misleading nature. Further each of the defendants and their "controlled persons" including, inter alia, the members of Evergreen Funds Board of Trustees, employed devices, schemes and artifices to defraud, while in possession of material adverse information not available to plaintiff and the members of the Federal Securities Sub-Class and engaged in the acts, practices and course of conduct as alleged herein, which included the making of, or the participation in the making of directly or through "controlled persons" untrue statements of material facts and/or omitting to state material facts necessary in order to make the statement made about the Evergreen Funds, the relationships between and among the defendants and the "controlled persons" and otherwise, not misleading as set forth above. By so doing, they engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of shares of Evergreen Funds including plaintiff and the members of the Federal Securities Sub-Class.

138. Each of such defendants and their "controlled persons" had actual knowledge of the misrepresentations and omissions of material facts set forth above or acted with reckless disregard for the truth. Such misrepresentations and/or omissions were carried out knowingly or recklessly for the purpose and effect of concealing the truth from plaintiff and members of the Federal Securities Sub-Class in connection with the purchase of shares of the Evergreen Funds for their fiduciary accounts by the Bank.

139. As a direct result thereof, and the manipulative scheme of which the issuance and dissemination of such Evergreen Funds prospectuses, written communications to beneficiaries of the Bank's fiduciary accounts and periodic statements of account were an integral part, the Bank caused Evergreen Funds shares to be purchased for the beneficial ownership of plaintiff and for the members of the Federal Securities Sub-Class, all of which was in violation of § l0b of the Exchange Act and

Rule 10b-5 promulgated thereunder by the SEC, all of which caused them damages in an amount which cannot presently be determined. Had the SEC known of the fact that the foregoing Evergreen Funds Registration Statements and Post-Effective Amendments were false and misleading and prepared in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, the SEC would not have declared such Registration Statements effective or permitted the sale of the Evergreen Funds registered thereby to be sold.

COUNT IV

**BREACH OF FIDUCIARY DUTY**

140. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

141. The Bank owed and has owed fiduciary duties to plaintiff and each member of the Class as defined herein. Each of the other defendants, in addition to having fiduciary obligations to such persons, actively participated with the Bank in its own breaches of fiduciary duty by, *inter alia,* facilitating the transactions described herein and failing to disclose all material facts with respect thereto to plaintiff and the other beneficiaries of the affected fiduciary accounts.

142. The Bank's decisions to invest the assets of the Brooks Trust and those of the members of the Class in the Evergreen Funds and other proprietary funds and to charge "sweep fees" to fiduciary accounts were motivated not by the interests of plaintiff and the Class members, but by the Bank's desire to generate investment advisory and other fees for itself and its affiliates and, as well as, to reduce the Bank's operating expenses, all of which as carried out in the manner described above, was wrongful and damaged plaintiff and each member of the Class.

143. Upon information and belief, in conspiracy with the other defendants, the Bank failed to consider the best interests of the fiduciary account of the Brooks Trust and the accounts of other members of the Class when it invested fiduciary assets in the Evergreen Funds and/or charged such accounts "sweep fees" as well as other unjustified charges and breached its duty of loyalty to plaintiff and other Class members by putting the interests of itself and its affiliates before the interests of plaintiff and the members of the Class.

144. As a result of, *inter alia,* the Bank's improper wholesale transfer of fiduciary assets held by the fiduciary accounts, including the assets of the Brooks Trust, into shares of the Evergreen Funds and other proprietary mutual funds, having those accounts charged "sweep fees", and/or being denied the use of "float" as described herein, plaintiff and other similarly situated beneficiaries of fiduciary accounts for which the Bank was or is a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial and well in excess of $5, 000,000.

## COUNT V

## **BREACH** OF CONTRACT

145. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

146. By means of the acceptance by the Bank and its predecessors to act as corporate fiduciary with respect to the Brooks Trust and each of the other fiduciary accounts maintained by the Bank and its predecessors, the Bank committed to provide to all such fiduciary accounts complete, totally objective and prudent investment management services of a corporate fiduciary and render such services on an individualized basis consistent with the goals and objectives of the creators of the fiduciary accounts (such as the Sponsors) and the needs of the beneficiaries thereof.

147. Such obligation of the Bank is an implied and material term in every agreement between the Bank and the creators of fiduciary accounts, such as the Sponsors, who appointed the Bank or any of the Acquired Banks as a corporate fiduciary, none of whom anticipated or could reasonably foresee that the Bank would breach its duty of loyalty to the creators of such accounts and their beneficiaries such as plaintiff and the members of the Class in the manner described herein.

148. Similarly, in the context of each of such agreements, there is an implied duty of good faith and fair dealing applicable, *inter alia,* to the beneficiaries of the Bank's fiduciary accounts. By acting in the manner described in this Complaint, the Bank breached such duties and damaged plaintiff and each member of the Class.

149. In addition to the contractual obligations of the Bank owed to members of the Class as described above, plaintiff and each member of the Class were and/or are third-party beneficiaries of the Bank's contractual obligations between and among the defendants with respect to the investment of fiduciary assets through the Evergreen Funds. Pursuant to contracts such as these, the defendants and particularly Evergreen Investment were obligated to plaintiff and the members of the Class to provide competent, objective investment management services to the Evergreen Funds at the lowest cost reasonably possible.

150. Instead, the Evergreen Funds were provided investment management and other services by Evergreen Investment on a no-bid basis which, as a result, damaged plaintiff and the members of the Class by costing their fiduciary accounts (and them indirectly) excessive fees and expenses, all of which damaged them in an amount that cannot presently be determined.

151. By abdicating its responsibilities for individual investment management services as described herein and by failing to select providers of services to the Evergreen Funds so as to minimize expenses consistent with prudent investment practices, all defendants breached their

implied and actual contractual obligations to such trust beneficiaries including plaintiff and the members of the Class.

152. By virtue of the defendants' breach of their respective contractual obligations owed to the members of the Class as described above, plaintiff and the members thereof have suffered damages in an amount to be determined at trial.

## COUNT VI

## UNJUST ENRICHMENT

153. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

154. By reason of the Bank's investment of fiduciary assets in affected accounts to be used to purchase shares of Evergreen Funds, the Bank and Wachovia have "double dipped" and obtained other unjustified benefits as described above including the receipt and retention of unjustified "sweep fees" and retention of "float" as described above.

155. Similarly, the Bank, both directly and indirectly charged more for the provision of services to plaintiff, the Brooks Trusts and those fiduciary accounts of members of the Class herein by failing to provide the fiduciary services contemplated by the underlying instruments for **reasonable** compensation.

156. Each of such unjustly enriched defendants has accepted and retained the foregoing benefits. As a matter of fact and law, it would be unjust and inequitable for such defendants to retain such benefits without compensating plaintiff and the members of the Class for such benefits.

157. The Bank enhanced its profit performance at the expense of plaintiff and the members of the Class by favoring the use of its own proprietary funds, including the Evergreen Funds, and

fiduciary assets within its control to increase the asset bases thereof, and aggrandizing its own stature, thereby unjustly enriching each of the defendants.

158. Further, the Bank has further unjustly enriched itself by not making timely credits to its fiduciary accounts of the amounts paid by the Evergreen Funds to EDI, EIS, Evergreen Investment and other subsidiaries of Wachovia or the Bank. As a result, during the time periods when the Bank had the use of these amounts (or "float") pre-crediting, it not only deprived plaintiff and the members of the Class the ability to have such "float" invested but unjustly enriched itself by investing such "float" and generating income thereupon for itself, which income was not credited back to the affected fiduciary accounts.

159. Each of the defendants has invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the fiduciary accounts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate.

160. Plaintiff and others similarly situated are entitled to recover the defendants' ill-gotten gains and the profits therefrom.

<u>DEMAND FOR **JURY** TRIAL</u>

Plaintiff hereby demands a trial by jury.

**<u>PRAYER</u> FOR RELIEF**

**WHEREFORE,** plaintiff respectfully requests on his own behalf and on behalf of all members of the Class and Sub-Classes:

(a)    Certification of this action as a class action and appointment of plaintiff and plaintiffs counsel to represent the Class and Sub-Classes;

(b)    entry of judgment on the claims for breach of fiduciary duty in favor of plaintiff individually and as representative of the other members of the Class and Sub-Classes and

against the defendants and an award of compensatory damages, restitution and punitive damages in favor of plaintiff individually and as representative of the other members of the Class and Sub-Classes and against the defendants in the amount of damages caused by the defendants' breaches of fiduciary duties;

(c)     entry of judgment on the claims for breach of contract in favor of plaintiff individually and as representative of the other members of the Class against the defendants and an award of compensatory damages in favor of plaintiff individually and as representative of the other members of the Class and against the defendants in the amount of damages caused by the defendants' breaches of contract including, in particular, the duty of good faith and fair dealing;

(d)     entry of judgment on the claims for violations of RICO in favor of plaintiff individually and as a member of the RICO Sub-Class against defendants Wachovia and the Bank and an award of compensatory damages trebled in favor of plaintiff individually and as a representative of the other members of the RICO Sub-Class and against defendants Wachovia and the Bank in the amount of damages caused by such defendants' violations of RICO and trebled.

(e)     entry of judgment on the claims for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in favor of plaintiff individually and as a member of the Federal Securities Sub-Class against defendants and an award of compensatory damages in favor of plaintiff individually and as a representative of the other members of the Federal Securities Sub-Class and against defendant in an amount of damages caused by such defendants' violations of § 10 (b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

(I)     entry of judgment on the claims for violations of §§ 11 and 12(a)(2) of the Securities Act including, as appropriate, compensatory and recissory damages and, as to those shares

of the Evergreen Funds upon which Federal Securities Sub-Class members who retain such shares, have sustained losses thereupon, the right to be repaid their purchase prices;

(g) entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(h)      entry of judgment compelling the defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts, including the Brooks Trusts account, affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(i)      entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of Wachovia, Evergreen and the Evergreen Funds by, *inter alia,* establishing a so-called "Chinese Wall" for the purpose of effectuating such insulation and/or requiring the Bank to totally "outsource" the asset management aspects of its fiduciary accounts to wholly independent vendors or internalize them fully within the Bank;

(j)      entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, *inter alia,* the appointment of an ombudsman to oversee the Bank's fiduciary operations and compelling Evergreen and the Bank's other operators of its proprietary mutual funds to select annually investment advisors based upon, *inter alia,* comparative investment performance and expenses;

(k)      repayment to the affected Evergreen Funds of the damages caused to them by the defendants' actions as described herein;

(l)     entry of judgment compelling the Bank to cease imposing "sweep fees" on its fiduciary accounts;

(m)     entry of judgment for punitive damages for plaintiff and each member of the Class, together with pre judgment and post judgment interest at the maximum rate allowable by law;

(n)     reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the net recovery to members of the Class; and

(o)     such other or additional relief as this Court deems appropriate.

JUNE 1, 2006

GREENFIELD & GOODMAN LLC

By:     _Richard D. Greenfield/Am_

RICHARD D. GREENFIELD
7426 Tour Drive
Easton, MD 21601
(410) 745-4149
(410) 745-4158 (Fax)
Email: whitehatrdg@earthlink.net

ANN MILLER, LLC

By:     _Ann Miller_

ANN MILLER
The Benjamin Franklin, Suite 206
834 Chestnut Street
Philadelphia, PA 19107
(215) 238-0468
(215) 574-0699 (Fax)
Email: am@attorneyannmiller.com

COUNSEL FOR PLAINTIFF AND THE CLASS

<u>CERTIFICATE OF **SERVICE**</u>

I, Ann Miller, co-counsel for the plaintiff in the foregoing action, do hereby certify that I caused to be served on this 1" day of June, 2006, via U.S. Mail, First Class, postage prepaid, a true and correct copy of Plaintiff's Amended Complaint on the following:

Andrew J. Soven
Elizabeth F. Abrams
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Gregory Jordan Mary
J. Hackett Sharon L.
Rusnak Reed Smith
LLP 435 Sixth Avenue
Pittsburgh, PA 15219

John D. Donovan
Ropes & Gray
One International Place
Boston, MA 02110-2624

Mark A. Landis
Ropes & Gray
One International Place
Boston, MA 02110-2624

Ann Miller